616 A.2d 380

Jose S. DELEON et ux.

v.

Elaine SLEAR et al.

No. 122, Sept. Term, 1990.

Court of Appeals of Maryland.

Dec. 10, 1992.

Howard J. Schulman, Baltimore, for petitioners/cross-respondents.

Catherine A. Potthast (John G. Prendergast, Jr., Smith Somerville & Case, all on brief), Baltimore, for respondents/cross-petitioners.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW and KARWACKI, JJ.

ELDRIDGE, Judge.

In this case we shall hold that the doctrine of res judicata generally applies to bar a plaintiff from suing employees for defamation occurring within the scope of employment, when that plaintiff has already unsuccessfully sued their employer for defamation, and when the alleged defamatory statements in both cases were part of the same transaction or transactions.

## I.

Dr. Jose deLeon is a surgeon who was employed by St. Joseph's Hospital in Baltimore, Maryland. Dr. deLeon came to the hospital in July 1980 as a third year resident after failing to be reappointed to residency programs at two other hospitals.

Between January 1983 and June 1983, during Dr. deLeon's period of residency, Elaine Slear, C.R.N.P., relayed complaints about Dr. deLeon's work to Dr. William L. Macon, IV, Chief of Surgery at the hospital. Nurse Slear was the supervising nurse practitioner at the hospital, and it was her duty to act as the liaison between the nurse

practitioners and Dr. Macon. Nurse Slear told Dr. Macon that other hospital physicians had asked that Dr. deLeon not be called to see their patients, that Dr. deLeon had failed to respond to an emergency call, and that Dr. deLeon was late for his scheduled surgeries causing patients to be anesthetized for unnecessarily long times.[1]

Beginning July 1, 1983, the hospital hired Dr. deLeon as a "house surgeon" on a contractual basis. As a house surgeon, he was permitted to see only hospital patients under the supervision of other physicians. In January 1984, Dr. deLeon applied for medical staff privileges which would allow him to admit his own patients and practice independently at the hospital. At the same time, he signed a release which read in pertinent part as follows:

"I release Saint Joseph Hospital, Inc., its agents, servants, employees and staff members from liability for all acts performed in connection with evaluating my application and my credentials, qualifications and practices, and I release from liability any and all individuals and organizations who provide information to Saint Joseph Hospital, Inc. concerning my professional competence, medical practice patterns, ethics, character, and other qualifications for staff appointment and clinical privileges. I consent to the release of such information, including otherwise privileged or confidential information to Saint Joseph Hospital, Inc."

Meanwhile, Dr. Macon continued to receive complaints about Dr. deLeon's work. On December 27, 1983, Dr. Macon telephoned Dr. deLeon and informed him that there had been a complaint by a nurse practitioner that he had refused to respond to a call to see a patient. Dr. Macon wrote a memorandum about the call. In the memorandum, Dr. Macon also noted a complaint that the nurse practitioners had tried, for forty-five minutes, to find Dr. deLeon to

---

1. Dr. deLeon denies that any of these incidents complained of actually occurred.

see a patient, and that when they finally found him, he was addressing Christmas cards.

On March 27, 1984, Dr. Macon wrote a letter to Dr. deLeon confirming a telephone call in which Dr. Macon had informed Dr. deLeon of other complaints regarding his unavailability. In the letter, Dr. Macon recounted an incident in which Dr. deLeon allegedly was called to come to the hospital when he was "on call" and did not come, and an incident in which Dr. deLeon was unavailable to the members of the operating room staff so that they were unable to schedule Dr. deLeon's cases in advance. On April 3, 1984, Dr. Macon wrote another letter to Dr. deLeon, discussing more complaints about his unavailability.

Notwithstanding these complaints, in July 1984, the hospital rehired Dr. deLeon as a house surgeon for another one-year term, while it investigated his credentials as part of his application for medical staff privileges. In the course of the investigation, the hospital asked physicians familiar with Dr. deLeon's work to comment on his abilities. Dr. Macon, as head of surgery, was also asked to comment. Dr. Macon submitted a letter in which he referred to the complaints he had received and reviewed Dr. deLeon's credentials. He concluded that Dr. deLeon's credentials were unsatisfactory and recommended that the application for privileges be denied.

On July 16, 1984, the Credentials Committee met, considered Dr. deLeon's application, and recommended that the application be denied. This recommendation was forwarded to the hospital's Medical Executive Committee, then to the Board of Trustees' Medical Staff Privileging Committee, and then to the full Board of Trustees. Each of these bodies independently reviewed Dr. deLeon's credentials, concluded that they were unsatisfactory, and each in turn voted to deny Dr. deLeon's application. Dr. deLeon was officially informed of the decision to deny his application for privileges on October 17, 1984. Dr. deLeon appealed the Board's decision through the hospital's review process.

Dr. deLeon remained at the hospital as a house surgeon pending his appeal. Complaints about his work continued. On May 3, 1985, Head Nurse Randy Broussard, R.N., wrote a memorandum to Dr. Macon, describing an incident in which an ophthalmology patient "climbed out of his bed, fell and struck his head near the R Orbit. The patient was also complaining of chest pain." According to the memorandum, a nurse called Dr. deLeon to see the patient, but Dr. deLeon refused. The memorandum stated that Dr. deLeon claimed that he, as a house surgeon, did not see ophthalmology patients. It was, however, hospital policy that house surgeons are responsible for the coverage of ophthalmology patients. Nurse Broussard's memorandum pointed out that the patient died within a few days after this incident. Dr. Macon wrote a letter to Dr. deLeon informing him of this complaint.

An Ad Hoc Committee of the Board of Trustees was formed to hear Dr. deLeon's appeal. It held a hearing on August 27, 1985, but was unable to reach a decision. A second Ad Hoc Committee was formed, which held its hearings on December 16 and 19, 1985. On February 12, 1986, the Second Ad Hoc Committee issued a report recommending that Dr. deLeon's application be denied. Dr. deLeon then submitted a supplemental written argument to the full board. The board again voted to deny Dr. deLeon's application on May 22, 1985.

That same day Dr. deLeon and his wife, who are citizens of the Philippines, filed a diversity action in the United States District Court for the District of Maryland against the hospital and Dr. Macon.[2] Dr. deLeon sought compensatory and punitive damages based on, *inter alia,* alleged defamation. Nurses Slear and Broussard were not named as defendants in this action. In count one of the amended federal complaint, Dr. deLeon set forth his basic factual allegations which were, *inter alia,* that the hospital's "os-

---

**2.** For convenience, Dr. deLeon and his wife collectively will hereinafter sometimes be referred to as "Dr. deLeon" or the "plaintiff."

tensible bases for [the] denial of privileges were that Dr. deLeon did not have satisfactory knowledge, judgment and clinical skills for the independent practice of surgery and had been incompetent during the course of his residency training and house staff appointment." It was alleged that the information offered in support of these conclusions was "supplied and procured by Dr. Macon and was false, unsubstantiated and distorted."

Count two of the federal complaint, charging defamation by the hospital, referred to the hospital's making

"many statements, written and oral, to the effect that Plaintiff did not have satisfactory knowledge, judgment and clinical skills for the independent practice of surgery and had been incompetent during the course of his residency training and house staff appointment and did stigmatize Plaintiff with the termination of his house staff officer contract, when Defendant St. Joseph knew the falsity thereof, as well as the falsity of the underlying medical and other information upon which such opinions and publications were based...."

Count four of the federal complaint, asserting defamation by Dr. Macon, alleged in part that the "specific information imparted by Defendant Dr. Macon, to the effect that Plaintiff ... had been incompetent during the course of his residency training and house staff appointment, was knowingly false or made in reckless disregard of the truth thereof...."

Dr. Macon, first in his answer to interrogatories filed on December 5, 1986, and then in a deposition in the federal action, identified Nurse Slear as the probable source of the majority of the complaints about Dr. deLeon. Dr. deLeon claims, however, that he did not learn the source of the complaints until July 1987, when he deposed Nurse Slear in the federal litigation. Dr. deLeon also took the deposition of Nurse Broussard in connection with the federal suit.

The United States District Court granted the defendants' Motion for Summary Judgment on all counts, holding in an

unreported opinion that there were several alternate grounds which required judgment for the defendants. Chief Judge Harvey, for the United States District Court, held that the release barred all of the claims against both the hospital and its employee Dr. Macon, that the defamation claims against the hospital and Dr. Macon were barred because "none of the statements relied upon have been published to a legally distinct third party," that Dr. Macon's statements were privileged under Maryland law and there was no showing of actual malice to overcome the privilege, and that none of the statements were defamatory.

The judgment of the United States District Court was affirmed by the United States Court of Appeals for the Fourth Circuit, *DeLeon v. St. Joseph Hosp., Inc.,* 871 F.2d 1229 (4th Cir.), *cert. denied,* 493 U.S. 825, 110 S.Ct. 87, 107 L.Ed.2d 52 (1989). In an opinion for the court by Judge Murnaghan, the Fourth Circuit agreed with the district court that "the release precluded recovery on every claim deLeon has alleged" (871 F.2d at 1236), that Dr. Macon's statements were conditionally privileged both under Maryland statutes and under Maryland common law and that there was no showing of actual malice to overcome the privilege (*id.* at 1237–1238), and that "none of the statements were defamatory" (*id.* at 1238). The United States Court of Appeals also agreed with the district court that there had been no publication by the Hospital, and the Court of Appeals held that there had been no *"actionable* publication" by Dr. Macon (*id.* at 1236–1237).

While the appeal to the Fourth Circuit was pending, Dr. deLeon and his wife, on July 12, 1988, brought the present defamation action in the Circuit Court for Baltimore City, against Nurses Slear and Broussard. Shortly thereafter, they filed an amended complaint containing ten counts. The first eight counts of the complaint set forth the particular defamatory acts which allegedly caused Dr. deLeon to be denied admitting privileges at the hospital, to lose his career as a surgeon, to suffer loss of income and loss of reputation, and to "endure stigma, humiliation, mental anguish and embarrassment." The first seven counts related

to alleged defamatory statements by Nurse Slear, and the eighth count related to alleged defamation by Nurse Broussard. The ninth and tenth counts were derivative claims in which Dr. deLeon and his wife asserted damage to their marital relationship.

More specifically, count one alleged that Nurse Slear told Dr. Macon that Dr. deLeon had "failed to respond to a patient in the hospital and that on December 17, 1983, nurse practitioners in the hospital had tried to find the Plaintiff for 45 minutes who was later found addressing Christmas cards." Count two asserted that Nurse Slear told Dr. Macon and others that the "Plaintiff had refused to respond to an evening call to come to the hospital operating room." Count three stated that she told Dr. Macon that Dr. deLeon "could not be reached while on call to cover the hospital for a period of several hours and particularly at 9:00 p.m., 11:15 p.m., and 12:00 a.m. and that a private attending physician finally had to be called to the hospital to evaluate the patient, who complained of chest pains." Count four alleged that Nurse Slear told Dr. Macon that Dr. deLeon "could not be reached by the night surgical nurse practitioner on several occasions." The allegedly defamatory statements contained in the first four counts were the same as the complaints reviewed by Dr. Macon in his memoranda, telephone calls, and letters to Dr. deLeon in December 1983 and 1984.

Count five charged that Nurse Slear told Dr. Macon that "various physicians had given orders that the Plaintiff was not to be called to see their patients." Count six asserted that she told Dr. Macon that "she attempted to reach the Plaintiff for over an hour to institute life-saving measures and when she could not reach the Plaintiff she stated to Dr. Tomhe that the Plaintiff failed to respond and that Dr. Tomhe should come to the hospital to institute emergency care and life-saving measures." In count seven, Dr. deLeon claimed that Nurse Slear told Dr. Macon that Dr. deLeon "would fail to appear to perform surgeries as he was scheduled to do and thereby caused patients to be anesthetized for over thirty-five (35) minutes without all surgeons

and personnel being present." The allegedly defamatory statements in counts five, six and seven are the same as statements described in Nurse Slear's deposition in the federal suit.

Count eight alleged that Nurse Broussard told Dr. Macon that Dr. deLeon had been called "to see a patient in severe distress after the patient had fallen and struck his head near the right orbit and complained of chest pain and that the Plaintiff had failed to respond to this emergency for several hours and suggested that the patient died as a consequence of the Plaintiff's inaction." This complaint was the subject of the May 1985 letter by Dr. Macon to Dr. deLeon.

Nurses Slear and Broussard moved for summary judgment and for sanctions, on the grounds that the action was barred by res judicata, collateral estoppel, and the statute of limitations.[3] The state court action was then stayed pending Dr. deLeon's appeal in the federal case to the United States Court of Appeals for the Fourth Circuit.

After the conclusion of the appeal in the federal case, the Circuit Court for Baltimore City (Ward, J.), by several orders, granted the defendants' summary judgment motion with respect to all ten counts of Dr. deLeon's amended complaint. On August 22, 1989, the court granted judgment for the defendants with regard to the first four counts on the grounds that they were barred by res judicata, collateral estoppel, and the statute of limitations. In the same order, the circuit court denied the defendants' motion for sanctions. On September 11, 1989, the court granted judgment for the defendants as to counts five, six, seven and eight, adopting the defendants' arguments that these

---

3. Maryland Code (1974, 1989 Repl.Vol.), § 5–105 of the Courts and Judicial Proceedings Article provides that "[a]n action for ... libel, or slander shall be filed within one year from the date it accrues." Generally with regard to when actions accrue, *see Poffenberger v. Risser*, 290 Md. 631, 431 A.2d 677 (1981). As to when an action for defamation (*i.e.* libel or slander) accrues, *see Sears, Roebuck & Co. v. Ulman*, 287 Md. 397, 412 A.2d 1240 (1980).

counts were barred by res judicata and collateral estoppel. On October 3, 1989, the court granted judgment for the defendants on counts nine and ten.

Dr. deLeon timely appealed to the Court of Special Appeals, which, in an unreported opinion, affirmed in part and reversed in part. The intermediate appellate court stated that the trial court erred in granting summary judgment in favor of the defendants on the basis of res judicata and collateral estoppel. In the view of the Court of Special Appeals, none of the counts were barred by res judicata or collateral estoppel because the defendants in this case were not "in privity with the defendants in the prior case," because the claims in the present case were not the same as any of the claims in the federal case, and because the issues to be litigated in the present case "were not matters actually litigated in the earlier suit." Consequently, the Court of Special Appeals reversed the judgments for the defendants on counts five through ten, as the judgments on those counts had been based solely on principles of res judicata and collateral estoppel. The Court of Special Appeals, however, agreed with the circuit court's alternate holding that counts one through four were barred by limitations, and the intermediate appellate court affirmed the judgments for the defendants on those counts.

Dr. deLeon petitioned and Nurses Slear and Broussard cross-petitioned this Court for a writ of certiorari, and we granted both petitions. *DeLeon v. Slear*, 321 Md. 449, 583 A.2d 249 (1990). The issues raised concern whether the various counts were barred by res judicata, collateral estoppel, and limitations. As we shall conclude that the circuit court correctly held that all counts were barred by res judicata, we shall not reach the parties' arguments with respect to collateral estoppel and limitations.

II.

In *Alvey v. Alvey*, 225 Md. 386, 390, 171 A.2d 92, 94 (1961), this Court set forth the traditional rule of res judicata as follows:

"The doctrine of *res judicata* is that a judgment between the same parties and their privies is a final bar to any other suit upon the same cause of action, and is conclusive, not only as to all matters that have been decided in the original suit, but as to all matters which with propriety could have been litigated in the first suit...."

The rule is designed to avoid the " 'expense and vexation attending multiple lawsuits, conserve judicial resources, and foster reliance on judicial action by minimizing the possibilities of inconsistent decisions.' " *Murray International Freight Corp. v. Graham*, 315 Md. 543, 547, 555 A.2d 502, 503–504 (1989), quoting *Montana v. United States*, 440 U.S. 147, 153–154, 99 S.Ct. 970, 973–974, 59 L.Ed.2d 210, 217 (1979).

■ The traditional principle of res judicata has three elements: (1) the parties in the present litigation should be the same or in privity with the parties to the earlier case; (2) the second suit must present the same cause of action or claim as the first; and (3) in the first suit, there must have been a valid final judgment on the merits by a court of competent jurisdiction. *Rowland v. Harrison*, 320 Md. 223, 229, 577 A.2d 51, 54 (1990); *Shum v. Gaudreau*, 317 Md. 49, 54, 562 A.2d 707, 709–710 (1989); *Cassidy v. Board of Education*, 316 Md. 50, 57, 557 A.2d 227, 230 (1989); *Cicala v. Disability Review Bd.*, 288 Md. 254, 263, 418 A.2d 205, 211 (1980); *MPC, Inc. v. Kenny*, 279 Md. 29, 32, 367 A.2d 486, 488–489 (1977); *Mettee v. Boone*, 251 Md. 332, 341, 247 A.2d 390, 395 (1968); *Alvey v. Alvey, supra,* 225 Md. at 390, 171 A.2d at 94; *Myers v. Gordon*, 165 Md. 534, 538–539, 170 A. 186, 187–188 (1934).

Neither party disputes that the federal judgment is a valid final judgment on the merits by a court of competent jurisdiction. *See Mettee v. Boone, supra* (summary judgment has preclusive effect); Restatement (Second) of Judgments § 19, comment g (1980) (summary judgment for the defendant is a valid and final judgment). Additionally, both parties recognize that the nurses were not parties to the

federal action. The arguments before us concerning res judicata have primarily centered on two questions: (1) whether the nurses were in privity with a party to the federal action so as to be entitled to avail themselves of the protection of res judicata, and (2) whether this case presents the same claim or claims which Dr. deLeon presented in the federal action.

## A. Privity

This Court has not squarely decided whether an employee is in privity with his employer, for purposes of res judicata, where a plaintiff brings a tort suit for damages against the employer, loses in the action against the employer, and then sues the employee for damages based upon tortious conduct occurring in the scope of employment and constituting the same "claim" as that involved in the earlier action.[4] Numerous other courts have addressed the issue, however, and have concluded that res judicata bars the plaintiff's suit against the employee in this situation.

For example, in *Mackey v. Frazier*, 234 S.C. 81, 106 S.E.2d 895 (1959), a truck owner sued an individual whose automobile hit his truck. The automobile owner counterclaimed against the truck owner, alleging that the truck owner's employee had been negligent in driving the truck. The judgment on the counterclaim was for the employer truck owner. Thereafter, the automobile owner brought a separate tort suit against the employee. The Supreme Court of South Carolina framed the issue as follows (234 S.C. at 84, 106 S.E.2d at 897):

"[W]hether when one sues the master for personal injury, caused by the sole negligence of the servant, and, failing in such action, can he then bring another action against the servant, alleging the same acts of negligence as the proximate cause of his injury and damage?"

---

4. *See,* however, *McKinzie v. Baltimore and Ohio Rail Road Company,* 28 Md. 161 (1868).

The court relied on decisions from other states in reaching its conclusion that the claim against the employee was barred by the judgment on the counterclaim in favor of the truck owner.

The Supreme Court of Arkansas in *Davis v. Perryman,* 225 Ark. 963, 966, 286 S.W.2d 844, 845–846 (1956), reached the same conclusion when it said that

"the cases from other jurisdictions are overwhelming in holding that an action like the present one cannot be maintained when a previous action by the same plaintiff against either the master or the servant for the same alleged act of negligence has been finally decided against the plaintiff in the Courts—State or Federal—of the same jurisdiction, and in which the scope of employment of the servant has been conceded at all times by the master and the only questions have been those of negligence and contributory negligence."

A case very much in point is *Michelson v. Exxon Research & Engineering,* 629 F.Supp. 418 (W.D.Pa.1986), *aff'd,* 808 F.2d 1005 (3d Cir.1987). *Michelson,* like the case at bar, involved separate defamation actions, one against the employer in federal court and one against another employee in state court. In *Michelson,* the plaintiff was the subject of an unfavorable performance review memorandum by a co-worker. The co-worker sent the memorandum to his superiors, one of whom sent copies to other managers. After being discharged for his low performance rating, the plaintiff Michelson sued his former co-worker in state court for damages resulting from alleged defamation, misrepresentation and intentional interference with contractual relations. At the same time, Michelson filed in federal court a suit against the supervisor and the corporate employer for damages based on alleged defamation, misrepresentation, interference with contractual relations, and wrongful discharge. The state proceedings resulted in a judgment for the defendant. The defendants in the federal suit moved for summary judgment, raising the defense of res judicata. The federal court granted the motion for

summary judgment, holding that the state court decision against the plaintiff precluded his claims for defamation and interference with contract. The court said (629 F.Supp. at 423):

"As to the identity of parties, defendant here faces liability for republication of allegedly defamatory material by an employee [the supervisor who was] not named in the state suit. As noted above, both [the co-worker and supervisor] were acting within the scope of their duties in their actions involving the memo. [The employer's] potential liability therefore is exclusively vicarious. Any judgment involving an employee for these acts would apply with the same effect to the employer, and vice versa. *See* Restatement (2d) of Judgments § 51 (1982). We thus find an effective identity of parties since both are bound by a judgment involving either of them."

In *Landess v. Schmidt*, 115 Wis.2d 186, 340 N.W.2d 213 (1983), the Wisconsin appellate court held that a judgment in favor of a corporation in an action for tortious interference with business relations barred a later claim against the corporation's employees for the employees' alleged conspiracy to destroy the plaintiff's business. The court held that the conspiracy counts presented the same claim as had been presented by the action for tortious interference with business relations, and that the prior judgment in favor of the corporation barred the subsequent action against the employees.

Other authorities are in accord with the holdings in the above-discussed cases. *See, e.g., Citibank, N.A. v. Data Lease Financial Corp.*, 904 F.2d 1498 (11th Cir.1990); *Gregory v. Chehi*, 843 F.2d 111 (3d Cir.1988); *Lober v. Moore*, 417 F.2d 714 (D.C.Cir.1969); *Emery v. Fowler*, 39 Me. 326, 63 Am.Dec. 627 (1855); *Giedrewicz v. Donovan*, 277 Mass. 563, 179 N.E. 246 (1932); *Myhra v. Park*, 193 Minn. 290, 258 N.W. 515 (1935); *Thirty Pines, Inc. v. Bersaw*, 92 N.H. 69, 24 A.2d 500 (1942); *Melchion v. Burkart*, 54 Ohio Law Abs. 287, 87 N.E.2d 373, 374 (Ohio Ct. of App.1948); *Jenkins v. Atlantic Coast Line R. Co.*, 89

S.C. 408, 71 S.E. 1010 (1911); Allen D. Vestal, *Res Judicata/Preclusion* 113–117 (1977) ("If the judgment for the principal was grounded on a determination that no tort was committed, then the judgment should protect the agent").

The Restatement (Second) of Judgments, § 51 (1982), also reflects this position. Section 51 of the Restatement provides in pertinent part:

"If two persons have a relationship such that one of them is vicariously responsible for the conduct of the other, and an action is brought by the injured person against one of them, the judgment in the action has the following preclusive effects against the injured person in a subsequent action against the other.

(1) A judgment against the injured person that bars him from reasserting his claim against the defendant in the first action extinguishes any claim he has against the other person responsible for the conduct unless:

(a) The claim asserted in the second action is based upon grounds that could not have been asserted against the defendant in the first action; or

(b) The judgment in the first action was based on the defense that was personal to the defendant in the first action."

\* \* \*

In the case at bar, Dr. deLeon argues that the exceptions set forth in (a) and (b) of § 51(1) are applicable. The comments and cases under § 51 make clear, however, that the present case does not fall within either of these exceptions.

As Comment c under § 51 points out, the exception in (a) contemplates the situation where the second action against the employee involves a claim that was not and could not have been asserted in the first action against the employer. Comment c states in pertinent part:

"The injured person's claims against the active wrongdoer and the person vicariously responsible for the latter's conduct are sometimes only partially congruent.

There may be a basis of liability that he can assert against one but not the other. The rule of claim preclusion is properly applied with respect to the claim that he has against them commonly but it should not apply to his independent claim against the obligor not sued in the first action. If the rule of claim preclusion were applied to that independent claim, the effect would be to compel a joinder of parties therein which by hypothesis he is not required to make."

An example of an independent claim within this subsection is given in illustration 4:

"P purchases goods from R, a retailer, who purchased them from M, a manufacturer. P brings an action against M, contending that the goods failed to conform to the standard of quality required by products liability law. A judgment for M precludes an action by P against R based on products liability law but does not preclude an action against R based on breach of a contractual representation by R that the goods were fit for the particular purpose intended."

Another example is found in illustration 5:

"P, an employee of M, is injured as the result of a blow from S, a fellow employee. P brings an action against S for assault, but judgment is for S. The judgment precludes an action by P against M based on M's vicarious responsibility for the acts of S but does not preclude P from seeking worker's compensation from M on the basis that the injury occurred in the course of his employment."

The illustrations under § 51 show that the exception in (a) contemplates allowing the plaintiff to bring the subsequent action only when there is actually a different claim. For the reasons set forth in Part II B of this opinion, Dr. deLeon does not assert an independent or different claim in his second action.

The exception set forth in (b) under § 51(1) of the Restatement is intended to prevent the second defendant from gaining the benefit of a defense that was personal to

the first defendant. Comment c states in relevant part as
follows:

> "So also his claim against one of the obligors may be
> subject to a defense that is not available to the other
> obligor. When such a defense has been interposed in the
> first action, a judgment against the injured person is not
> incompatible with his obtaining a judgment against the
> other obligor, any more than it would be if they were
> sued in the same action."

The personal defenses contemplated by exception (b) include
statutory immunity and privilege if they were available to
the defendant in the first suit but are not available to the
defendant in the second suit. For example, illustration 6
sets forth the following scenario:

> "P brings an action against M, alleging that S committed
> assault while in M's employ. M defends on the ground
> that his liability, if any, is under the worker's compensa-
> tion law. A judgment for M does not preclude an action
> by P against S, unless under applicable law in such
> circumstances an employee is immune from suit by a
> fellow employee if the latter is covered by worker's
> compensation."

Dr. deLeon argues that the judgments in favor of the
hospital and Dr. Macon were based on defenses of statutory
immunity and privilege. It is true that both the federal
district court and the Fourth Circuit held that Dr. Macon's
statements were subject to conditional privilege under Ma-
ryland law. Nevertheless, as earlier pointed out, the feder-
al courts alternatively based the judgments on other
grounds.

Moreover, the decision of the federal courts concerning
conditional privilege would seem to be fully applicable to
the statements by Nurses Slear and Broussard. The
Fourth Circuit held that Dr. Macon's statements were condi-
tionally privileged under what is now Maryland Code (1981,
1991 Repl.Vol.), §§ 14–501(f) and 14–504(c) of the Health
Occupations Article, which, *inter alia,* grants an immunity
from liability to persons "for giving information to ... or

contributing to the function of" a medical review committee. The Fourth Circuit alternatively held (871 F.2d at 1237–1238) that Maryland common law

"recognizes that communications arising in an employment context or by common interest in the subject matter are privileged. *See, e.g., General Motors Corp. v. Piskor,* 277 Md. 165, 352 A.2d 810 (1976); *Hanrahan v. Kelly,* 269 Md. 21, 305 A.2d 151 (1973); *Exxon Corp. v. Schoene,* 67 Md.App. 412, 508 A.2d 142 (1986). The privilege is particularly apt in the present context, since the privilege, along with others, arose by way of recognition of the desirable public benefit of encouraging uninhibited communication where a public or private duty may lie. *See Simon v. Robinson,* 221 Md. 200, 206, 154 A.2d 911, 915 (1959)."

In the context of this case, Nurses Slear and Broussard would appear to enjoy the same conditional privileges applicable to the information furnished by Dr. Macon. Therefore, in this case we are not dealing with a "defense" that was personal to Dr. Macon but not enjoyed by Nurses Slear and Broussard. For this reason also, the case does not fall within exception (b).

We conclude that the nurses, by virtue of their employment relationship with the hospital, are in privity with the hospital for purposes of applying the doctrine of res judicata. They were employed by the hospital at the time of the alleged defamations, and it is undisputed that the nurses were acting in the scope of their employment. The basis for Dr. deLeon's federal court defamation action against the hospital was that the hospital, a corporation, was liable for defamatory statements allegedly made by its employees. For the reasons set forth in Part II B below, the claims against the hospital and the claims against the two nurses are the same. Under the previously discussed cases and other authorities, there is privity between the

nurses and the hospital.[5]

---

5. Even if the hospital and the nurses were not deemed to be in privity, the result in the present case would not likely be different. This Court has relaxed somewhat the strict requirements of privity and mutuality, for purposes of res judicata and collateral estoppel, in situations where the plaintiff had a full and fair opportunity to litigate the same claim in the prior proceeding. In these instances, a defendant not in privity with a defendant to the first suit may invoke the defense of res judicata, *Pat Perusse Realty v. Lingo*, 249 Md. 33, 238 A.2d 100 (1968), or collateral estoppel, *MPC, Inc. v. Kenny*, 279 Md. 29, 367 A.2d 486 (1977). For detailed discussions of the rationale behind modifying the privity and mutuality requirements, *see Pat Perusse Realty v. Lingo, supra,* and *Lober v. Moore,* 417 F.2d 714, 716–717 (D.C.Cir. 1969). *See also, Blonder–Tongue v. University Foundation,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971); *Bernhard v. Bank of America Nat. Trust & Sav. Ass'n.,* 19 Cal.2d 807, 122 P.2d 892 (1942); *Lukacs v. Kluessner,* 154 Ind.App. 452, 290 N.E.2d 125 (1972); *Schwartz v. Public Administrator,* 24 N.Y.2d 65, 298 N.Y.S.2d 955, 246 N.E.2d 725 (1969); *Bahler v. Fletcher,* 257 Or. 1, 474 P.2d 329 (1970); *Olivarez v. Broadway Hardware, Inc.,* 564 S.W.2d 195 (Tex.1978); Restatement (Second) Judgments, § 29 (1980) (Reporter's note); Allen D. Vestal, *Res Judicata/Preclusion* (1977); Fleming James, Jr. and Geoffrey C. Hazard, Jr., *Civil Procedure,* sec. 11.24 (1985) (discussion of mutuality rule).

As indicated above, a defendant who was not in privity with a defendant in the first action must show that the plaintiff had a full and fair opportunity to litigate the same claim in the first action. *Pat Perusse Realty, supra,* 249 Md. at 45, 238 A.2d at 107 ("Perusse, in its suit against Ted, had its full day in court and full opportunity to win on its claim.... Its claim was decided against it"). *See Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982). *See also* 1B Moore's Federal Practice § 0.441 [3.–3] at 740 (1992). In this case, Dr. deLeon clearly had a full and fair opportunity to litigate his claim in the federal court. The United States Court of Appeals for the Fourth Circuit pointed out (*DeLeon v. St. Joseph Hosp., Inc., supra,* 871 F.2d at 1232 n. 5):

"The district court, in its opinion, observed:

'In a desperate effort to uncover evidence which might support his claims, plaintiff has in this court employed a strategy of deposing nearly everyone who had any contact with him while he worked at the Hospital. This approach, however, has been completely unsuccessful in uncovering evidence favorable to the plaintiff.'"

The Fourth Circuit also observed that the discovery included "over twenty depositions" and that "[l]engthy memoranda and numerous exhibits were submitted by both sides." *Id.* at 1232. Nevertheless, the district court found that Dr. deLeon "failed to establish a triable issue of fact under any of the legal theories advanced." Dr. deLeon has had the fullest and fairest opportunity to litigate his claim. Consequently, it would appear that the nurses would be entitled to the benefit of the

## B. Same Claim

In order for res judicata to be applicable, Dr. deLeon must be attempting to relitigate the same "claim" or "cause of action" in the second action as in the first.

In determining whether claims are the same for purposes of res judicata, we have in the past sometimes utilized a "same evidence" test. *See MPC, Inc. v. Kenny, supra,* 279 Md. at 33, 367 A.2d at 489. We have indicated, however, that the concept of a "claim" is broad. *See, e.g., Edmonds v. Lupton,* 253 Md. 93, 252 A.2d 71 (1969) (defining a "claim" as "a group or aggregate of operative facts giving ground or occasion for judicial action, as distinguished from the narrow concept of a 'cause of action' ").

Recently, in *Kent County Bd. of Educ. v. Bilbrough,* 309 Md. 487, 525 A.2d 232 (1987), we adopted the "transaction" test, as set forth in § 24 of the Restatement (Second) of Judgments, as the basic test for determining when two claims or causes of action are the same for purposes of res judicata. *See also Rowland v. Harrison, supra,* 320 Md. at 230 n. 2, 577 A.2d at 54 n. 2; *Shum v. Gaudreau, supra,* 317 Md. at 54–55, 562 A.2d at 710.

In *Kent County Bd. of Educ. v. Bilbrough, supra,* 309 Md. at 497–498, 525 A.2d at 237–238, Judge Rodowsky for the Court explained as follows (footnote omitted):

"Restatement (Second) of Judgments describes the current approach of courts to answering the same claim—separate claim conundrum in § 24, comment *a,* at 197:

The present trend is to see claim in factual terms and to make it coterminous with the transaction regardless of the number of substantive theories, or variant forms of relief flowing from those theories, that may be available to the plaintiff; regardless of the number of primary rights that may have been invaded; and regardless of the variations in the evidence needed to

res judicata defense even if they were not in privity with a defendant in the prior action.

support the theories or rights. The transaction is the basis of the litigative unit or entity which may not be split.

Consequently, the American Law Institute in § 24 of Restatement (Second) of Judgments has adopted the following standards for determining the 'Dimensions of "Claim" for Purposes of Merger or Bar—General Rule Concerning "Splitting" ':

(1) When a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar (see §§ 18, 19) the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.

(2) What factual grouping constitutes a 'transaction', and what groupings constitute a 'series', are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." [6]

In light of these principles, the Court in *Bilbrough,* 309 Md. at 500, 525 A.2d at 238–239, held that the claims there were separate because two separate transactions were involved. In reaching this conclusion, the Court pointed out that the two actions concerned different matters, that "the core of the activities complained of by the respondent in the two

---

**6.** Numerous other jurisdictions have also adopted the "transaction" test. *See, e.g., Duhaime v. American Reserve Life Ins.,* 200 Conn. 360, 511 A.2d 333 (1986); *Signo v. Fla. Farm Bur. Cas. Ins. Co.,* 454 So.2d 3 (Fla.App.1984); *Aldape v. Akins,* 105 Idaho 254, 668 P.2d 130 (Ct.App. 1983); *Noel v. Noel,* 334 N.W.2d 146 (Iowa 1983); *Beegan v. Schmidt,* 451 A.2d 642 (Me.1982); *Dwight v. Dwight,* 371 Mass. 424, 357 N.E.2d 772 (1976); *Lougee v. Beres,* 113 N.H. 712, 313 A.2d 422 (1973); *Rennie v. Freeway Transport,* 294 Or. 319, 656 P.2d 919 (1982); *Juneau Square v. First Wis. Nat. Bank of Mil.,* 122 Wis.2d 673, 364 N.W.2d 164 (1985).

actions occurred at different times," and that the activities occurred at different places.

■ Applying the factors set forth in *Bilbrough* and in § 24 of the Restatement to the instant case, however, compels the conclusion that the earlier suit against the hospital and the present suit involve the same transaction or the same series of transactions. With respect to whether the facts of each case "are related in time, space, origin or motivation" (§ 24(2)), both the alleged defamatory statements in the federal case and the alleged defamatory statements in the present case occurred over the same period of time, in the same place, and had essentially the same origin and motivation. In fact, to a great extent, the two lawsuits are based on the same alleged defamatory statements.

As earlier discussed, Dr. deLeon's federal court complaint broadly charged that he was defamed by "many statements, written and oral" by hospital personnel, during both the period of "his residency training" and the period of his "house staff appointment," to the effect that his judgment and clinical skills were unsatisfactory and that he had been incompetent. The federal court complaint encompassed both the allegedly false conclusory opinions and determinations to this effect, "as well as the fals[e] ... underlying medical and other information upon which such opinions and publications were based." The federal complaint expressly included the "information offered in support of [the hospital's] conclusions" which was "procured by Dr. Macon" and was allegedly "false, unsubstantiated and distorted." The federal complaint, therefore, was in part based on the very same allegedly defamatory statements, given to Dr. Macon by Nurses Slear and Broussard, which are the subject of the present case. The alleged defamatory statements in this case not only were made at the same time, at the same place, and with the same origin or motivation, but they are the same as many of the statements on which the federal litigation was based.

Dr. deLeon, in his brief in this Court, argues that his focus in the federal case was upon the hospital's denial of

privileges and upon the statements made by Dr. Macon. Dr. deLeon argues that the issues in the federal litigation were whether Dr. Macon acted with malice or in bad faith, whether Dr. Macon was guilty of "egregious conduct," and whether Dr. Macon's statements were constitutionally protected or privileged. Dr. deLeon continues (brief, at 17):

"Here, by contrast, the essential and material facts are statements made by Slear and Broussard and their knowledge that their statements were false or made with a reckless disregard of the truth. The Defendants' alleged statements and publications in this case are different from those made by Dr. Macon, although Dr. Macon may have republished the statements of the defendants."

That Dr. deLeon in the federal case may have focussed on the hospital's final action and on Dr. Macon's statements, which is understandable as Dr. Macon was the only individual defendant named in that case, does not change the nature of the claims set out in the federal complaint. The defamation count against the hospital in the federal action was not limited to the hospital's ultimate decision or the statements by Dr. Macon; in fact, the count against the hospital did not even mention Dr. Macon. The federal complaint generally referred to numerous written and oral defamatory statements on behalf of the hospital, as well as the underlying information on which the statements were based. To reiterate, the complaint filed in the United States District Court clearly embraced the statements by Nurses Slear and Broussard which are the subject of this state court suit.

Moreover, as previously noted, *supra* n. 4, after filing the complaint, the plaintiff in the federal case did not limit himself to the hospital's final decision or to the statements by Dr. Macon. As Chief Judge Harvey indicated for the federal district court, Dr. deLeon deposed a multitude of persons, including Nurses Slear and Broussard, in "a desperate effort to uncover evidence which might support his claims," but Dr. deLeon was "completely unsuccessful." In ruling on the defendants' motion for summary judgment,

Chief Judge Harvey in his memorandum opinion considered *inter alia* "the deposition testimony of the many . . . nurses who had contact with Dr. deLeon." Both Chief Judge Harvey's opinion and the Fourth Circuit's opinion (*e.g.*, 871 F.2d at 1235–1236) discussed some of the very incidents recounted by Nurses Slear and Broussard and which furnish the grounds for the present state court action. Chief Judge Harvey also pointed out that the "[p]laintiff has sought to relitigate in this Court each and every controverted incident discussed before the various hospital bodies that considered his application."

It is obvious that the alleged defamation in the present case, *i.e.*, the statements during 1983–1985 by Nurses Slear and Broussard to Dr. Macon, about incidents involving Dr. deLeon and relating to Dr. deLeon's professional fitness and competency, constituted an integral part of the claims in the earlier federal litigation. The incidents recounted by the two nurses were largely the foundation for the actions taken by Dr. Macon and the hospital; they were the core of the federal suit. In addition, the principal damage allegedly resulting from the defamation in the present case was Dr. deLeon's being denied privileges at St. Joseph's Hospital and the harm to his career and reputation resulting therefrom. This was identical to the principal damage claimed in the federal case. *Cf. Kent County Bd. of Educ. v. Bilbrough, supra,* 309 Md. at 501, 504, 525 A.2d at 239–241. Furthermore, the federal courts' rulings on certain specific issues, such as the effect of the release signed by Dr. deLeon and conditional privilege under Maryland law, would appear to be dispositive in the present case.

Under the principles set forth by this Court in *Kent County Bd. of Educ. v. Bilbrough, supra,* the earlier federal suit and the present action both arose out of the same transaction or series of transactions. Consequently, they involved the same claim or claims. The Circuit Court for Baltimore City, therefore, correctly held that the principle of res judicata bars Dr. deLeon and his wife from relitigating the same claim or claims.

**594**

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART, AND CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO AFFIRM THE JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE PLAINTIFFS.