**Jose S. DE LEON, M.D.; Maria G. De Leon, his wife, Plaintiffs–Appellants,**

v.

**SAINT JOSEPH HOSPITAL, INC.; William L. Macon, IV, M.D., Defendants–Appellees.**

No. 88–1018.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 31, 1988.

Decided April 6, 1989.

---

Howard J. Schulman, Baltimore, Md., for plaintiffs-appellants.

Catherine Angela Potthast (John G. Prendergast, Jr., Barry Bach, Smith, Somerville & Case, Baltimore, Md., on brief), for defendants-appellees.

Before WIDENER, MURNAGHAN and CHAPMAN, Circuit Judges.

MURNAGHAN, Circuit Judge:

Once again this court must consider a medical doctor's attempt by an action for defamation to counter a hospital's denial of staff privileges. *See Sibley v. Lutheran Hospital,* 871 F.2d 479 (4th Cir.1989). Once again we find the effort futile.

Jose S. De Leon, M.D., a surgeon, completed his residency at St. Joseph's Hospital in Baltimore, Maryland and was subsequently employed by it on a contractual basis as a "house surgeon." De Leon applied for admitting privileges at the hospital, but was rejected. He then filed suit against the hospital and Dr. William Macon, its Chief of Surgery, in the United

States District Court for the District of Maryland, alleging breach of contract, defamation, tortious interference with prospective advantage and loss of consortium. On March 3, 1988, Judge Alexander Harvey, II entered summary judgment for the defendants on all claims. De Leon has appealed the grant of summary judgment on the defamation claim.

## I.

De Leon, a Filipino national, received his medical degree from the University of the Philippines in 1970. He performed a general surgical residency at the Philippines General Hospital Medical Center from 1970 until 1975. In 1976 he emigrated to the United States. De Leon underwent a one-year fellowship at the Texas Heart Institute and an internship and residency at the Brooklyn–Cumberland Medical Center from 1977 to 1979. De Leon then transferred to the Pennsylvania College of Medicine for his second year of residency. Due to poor performance, he was not reappointed to a third year residency and was forced to apply elsewhere.

Although De Leon submitted numerous applications, St. Joseph Hospital (the Hospital) was the only institution willing to accept him at a third year level (the others required him to repeat his second year). De Leon completed his third, fourth and fifth (final) years of residency at St. Joseph. He was then hired by St. Joseph on a contractual basis as a "house surgeon" for the period of July 1, 1983 to June 30, 1984. A "house surgeon" could not admit patients to the hospital and was required to treat patients only under the supervision of another physician.[1]

In January of 1984 De Leon applied for medical privileges that would allow him to admit patients to the Hospital. As part of the application, De Leon signed a release absolving the Hospital, its agents and others, including those providing information to the hospital, from civil liability connected with the application process.

Pursuant to the Hospital's Bylaws, De Leon's application was forwarded to the Credentials Committee, consisting of seven appointed and elected members. Appraisal forms were sent out to De Leon's references and his previous employers. Macon, the head of surgery, was required to assess De Leon's qualifications. Macon supervised the house surgeons and was in a position to evaluate De Leon's medical skills.

Macon submitted a letter concerning De Leon's qualifications to the Credentials Committee. Macon concluded De Leon's qualifications were unsatisfactory and recommended that his application be denied.[2] The district court summarized De Leon's credentials as follows:

> Dr. Macon had received numerous complaints concerning Dr. de Leon's failures to show up for his required duties, concerning his refusals to see patients when requested to and concerning his unavailability on numerous occasions when he was "on call."
>
> Dr. de Leon's abilities as a surgeon were also questionable. One doctor who had supervised him during his residency had commented on his extreme hesitancy and nervousness during surgery. Another doctor who had supervised Dr. de Leon had, in fact, voted against permitting de Leon even to continue his residency because of doubts about his competency. These subjective impressions were confirmed by Dr. de Leon's performance on objective tests. During his residency at the Brooklyn–Cumberland Medical Center, he scored in the 21st percentile [1] on the In–Training Examination. During his residency at the Hospital, he scored in the 11th percentile in a similar test. Moreover, he failed the American Board of Surgery's examination for board certi-

---

1. De Leon's contract was subsequently renewed for an additional year, but was not completed.

2. The voluminous record is replete with references to De Leon's medical abilities and work conduct. Upon reviewing the record, it appears clear that De Leon is at best a mediocre physi-

cian. A fair reading of the record would put him considerably below even that minimum threshold. It is also clear that, in the abstract, the hospital was justified in denying him credentials.

fication in 1983, scoring in the 17.6 percentile.[2]

[1] An examinee's percentile ranking is the standardized measure, reported on a scale of one to one hundred, of how he had performed compared to all other examinees. For instance, an examinee who received the tenth highest grade out of a group of one hundred examinees would score in the 90th percentile, as would an examinee who received the second highest grade out of a group of twenty examinees.

[2] In subsequent attempts, Dr. de Leon had repeatedly failed the examination for Board certification. In 1984, he scored in the 9th percentile; in 1985, he scored in the 7th percentile; and, in 1986, he again scored in the 7th percentile. A doctor designated as an expert by plaintiff has stated that even if de Leon took a full year or more off to study, it is highly doubtful that he would ever pass the examination for board certification.

On July 16, 1984, the Credentials Committee met and considered De Leon's application. The Committee found De Leon's credentials to be unsatisfactory. Pursuant to the Hospital Bylaws, the negative recommendation was forwarded to the Hospital's Medical Executive Committee, to the Board of Trustees Medical Staff Privileging Committee and finally to the full Board of Trustees of St. Joseph Hospital (the Board). Each body reviewed the record and independently determined De Leon's credentials were unsatisfactory. On September 27, 1984, the Board voted to deny De Leon's application.

De Leon appealed the Board's decision.[3] An *Ad Hoc* committee of the Board was formed to hear De Leon's appeal. A hearing was held on August 27, 1985, but the committee did not reach a decision.[4] The committee was reformed and additional hearings were held on December 16 and 19, 1985. At the hearings, the district judge found:

3. De Leon did not appeal within the 14 days specified in the Hospital's Bylaws. Nevertheless the Board, pursuant to a stipulation reached with counsel, agreed to hear De Leon's appeal.

4. The committee felt it was "satisfied with Dr. De Leon's credentials ... through the conclusion of his residency," but did not "believe that it has received sufficient information about Dr. De Leon from the expiration of his residency to the current time."

5. The district court, in its opinion, observed:

De Leon was accorded the full panoply of due process rights. His counsel was given De Leon's credentials file; the testimony of witnesses was presented, and his attorney cross-examined witnesses on de Leon's behalf. Following the hearings, the *Ad Hoc* committee allowed de Leon to submit supplemental written argument.

On February 12, 1986, the *Ad Hoc* committee issued an 11–page report recommending De Leon's application be denied. De Leon's counsel was permitted to submit written supplemental and rebuttal argument to the full Board. On May 22, 1986, the full Board met, considered De Leon's appeal, and voted to deny the application.

That day, De Leon filed suit in the United States District Court for the District of Maryland. De Leon sued the hospital for breach of contract, defamation and interference with economic advantage. De Leon also sued Macon for interference with economic relations and defamation. The complaint also contained a derivative claim for loss of consortium on behalf of De Leon's wife. De Leon sought injunctive relief, compensatory and punitive damages.

Ample discovery was conducted by both sides, including over twenty depositions.[5] Motions for summary judgment were filed on behalf of the defendants. Lengthy memoranda and numerous exhibits were submitted by both sides. Oral argument was heard on February 19, 1988. Thereafter, Judge Harvey granted summary judgment for the defendants on all counts. De Leon appealed.[6]

De Leon contends that the trial court erred in granting summary judgment to the defendants St. Joseph Hospital and Ma-

In a desperate effort to uncover evidence which might support his claims, plaintiff has in this court employed a strategy of deposing nearly everyone who had any contact with him while he worked at the Hospital. This approach, however, has been completely unsuccessful in uncovering evidence favorable to the plaintiff.

6. De Leon has only raised on appeal the grant of summary judgment on the defamation counts.

con on the defamation counts. An appellate court normally reviews a grant of summary judgment *de novo,* applying the same standard as the district court. *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987).

The defendants, in moving for summary judgment, have the burden of showing that no genuine issue of material fact exists and that they are entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Barwick v. Celotex Corp.,* 736 F.2d 946, 958 (4th Cir.1984). As the district court correctly identified, this burden may be met by the use of "affidavits, exhibits, depositions and other discovery materials." *Barwick,* 736 F.2d at 958. Once a defendant has met this burden, the plaintiff must go forward and produce sufficient evidence to support his contentions. "A mere scintilla of evidence is not enough to support a fact issue; there must be evidence on which a jury might rely." *Barwick,* 736 F.2d at 958–59 (quoting *Seago v. North Carolina Theatres, Inc.,* 42 F.R.D. 627, 640 (E.D.N. C.1966), *aff'd,* 388 F.2d 987 (4th Cir.1967), *cert. denied,* 390 U.S. 959, 88 S.Ct. 1039, 19 L.Ed.2d 1153 (1968)).

The standard for granting summary judgment is akin to that of granting a directed verdict:

[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.... [T]he judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the

plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986) (citations deleted).

■ The proper analysis, therefore, is not simply whether there were disputed issues of fact; clearly De Leon has met that simple burden. "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Even after considering the record in the light most favorable to De Leon, we are unable to detect any issue of fact relevant to the disposition of the case that would preclude the defendants from judgment as a matter of law.[7]

## II.

The district court based its grant of summary judgment on four major points:

(1) De Leon's claims were barred by a release executed by him at the time of his application for admitting privileges.

(2) De Leon's claims were legally insufficient because there has been no publication of the allegedly defamatory material.

(3) Even if defamatory, Macon's statements were privileged under Maryland law.

(4) The statements were not defamatory.

If even one of the above contentions is correct, the grant of summary judgment is proper. We address each point in the sequence adopted by the district court.

---

**7.** Although the district court did not address it, *Anderson, supra,* mandates that a motion for summary judgment "necessarily implicates the substantive evidentiary standard of proof that would apply at a trial on the merits." 477 U.S. at 252, 106 S.Ct. at 2512. Here, as in *Anderson,* this court is dealing with a defamation claim involving conditionally privileged material (whether by statute or common law). *New York Times* malice must be shown by clear and

convincing evidence. *Harnish v. Herald Mail Co.,* 264 Md. 326, 335–36, 286 A.2d 146, 152 (1972). *Cf. New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Jacron Sales Co. v. Sindorf,* 276 Md. 580, 597–601, 350 A.2d 688, 698–700 (1976). The judge must consider the evidentiary burden the plaintiff must meet before sending the case to the jury. Under this heightened scrutiny, De Leon's case appears even more flimsy.

### A.

In connection with his application for admitting privileges, De Leon executed a release agreement providing:

> I hereby authorize Saint Joseph Hospital, Inc. to consult with administrators and members of the Medical Staff of other hospitals or Institutions with which I have been associated and with others, including past and present malpractice carriers, who may have information bearing on my professional competence, character and ethical qualifications. I consent to the inspection of all documents and data, including Medical Records at other hospitals and other sources of available data, that may be material to any evaluation of my professional qualifications and competence to carry out the clinical privileges requested, my pattern of practice, as well as my physical and mental health status and moral and ethical qualifications for Medical Staff membership.
>
> I release Saint Joseph Hospital, Inc., its agents, servants, employees and staff members from liability for all acts performed in connection with evaluating my application and my credentials, qualifications and practices, and I release from liability any and all individuals and organizations who provided information to Saint Joseph Hospital, Inc. concerning my professional competence, medical practice patterns, ethics, character, and other qualifications for staff appointment and clinical privileges. I consent to the release of such information, including otherwise privileged or confidential information to Saint Joseph Hospital, Inc.

The district court found the release a bar to all of De Leon's claims. The court correctly recognized that, "[u]nder Maryland law, absent circumstances not present here, parties may validly exculpate themselves from liability for anything short of 'willful, wanton, reckless or gross conduct'" (quoting *Boucher v. Riner*, 68 Md.App. 539, 543, 514 A.2d 485, 488 (1986)). The court found De Leon failed to point to specific facts that would establish "extreme or wanton conduct" on the part of the defendants.

■■■ De Leon argues that Macon, by making allegedly malicious and intentionally false statements to the Board and Committees considering De Leon's application,[8] and the Hospital, by intentionally denying De Leon's application on the basis of such statements, are each guilty of such willful and wanton conduct that the release is no longer effective. In illustration, De Leon has proceeded, to paraphrase the district court, to attempt to relitigate every allegation discussed before the various hospital bodies that considered his applications. The district court correctly refused to review the "correctness" of the hospital's decision.[9] Thus, the sole task for this court is to determine if De Leon has estab-

---

8. Expressions of opinion, of course, are protected speech under the First Amendment. De Leon alleges Macon supported his opinions about De Leon with written and other statements of fact that he knew to be false or made them with reckless disregard for their truth. De Leon also stated that Macon acted without good faith and with the intent to harm him. Thus, De Leon concludes, Macon has forfeited any immunity granted by the release (and, in addition, any statutory or common law privilege). The district court, with justification, however, failed to find any facts demonstrating extreme or wanton conduct, or bad faith or malice on the part of Macon.

9. Courts have been reluctant, and with good reason, to intervene in any hospital credentialing process. Public policy concerns obviously weigh heavily towards leaving such determinations to the hospitals themselves. In *Levin v. Sinai Hospital*, 186 Md. 174, 46 A.2d 298 (1946), a doctor sued a hospital which refused him full staff privileges. The court found for the hospital, concluding:

> We hold that a private hospital has the right to exclude any physician from practicing therein, and such exclusion rests within the sound discretion of the managing authorities.... A private hospital is not under a common law duty to serve everyone who applies for treatment or permission to serve. In the absence of statute, it may accept some applicants and reject others. Likewise, the directors of a private hospital corporation having power to appoint members of its medical staff, have the authority to remove them from the staff. It has never been the policy of the State of Maryland to interfere with the power of the governing body of a private hospital to select its own medical staff.

186 Md. at 179–80, 46 A.2d at 301 (citations omitted).

lished a factual or legal basis for reviewing the Hospital's decision at trial. The district court concluded that De Leon "failed to establish a triable issue of fact under any of the legal theories advanced." The legal theories advanced on appeal are no more meritorious.

As a prime example, De Leon alleged that Macon made the following seven false statements, and also alleged facts from which he claimed the jury could have inferred that Macon had known of their falsity and that further reflected his bad faith and intent to harm.

(1) "There have been complaints from other physicians that Dr. De Leon has not been of good assistance to them in the Operating Room."

De Leon has alleged that, to back the statement up, Macon could supply only one physician's name—that of Dr. John E. Miller, who in actual fact recommended De Leon favorably. However, Macon also discussed the complaints of a Dr. Roberto Ferrer. Furthermore, Miller's deposition and appraisal form do not support De Leon's assertion. In his deposition, Miller recalled communicating to Macon a problem with De Leon during operations, a "disturbing" tendency during most operations to crack under pressure. Miller gave as an answer:

A. When you reached a critical area in the operation, which the risk was high, he had a tendency to start to cough which became increasingly to the point that it was almost like he was choking on his saliva, and all this meant was that this was tension.

Miller further stated that he indicated this obliquely on his appraisal by writing "no vascular," which of the procedures requested by De Leon involved high tension.

(2) "De Leon had refused to respond to an elderly patient who had fallen and injured his head and was complaining of chest pains, thereby contributing to the patient's death."

Macon stated that it was *reported* to him that De Leon had refused to see the patient. There is no question that it was. To escape the consequence of that fact, De Leon has quibbled as to the exact problems with the patient, implying Macon had access to the chart and knew the patient had no head injury or chest pains at the time.

■ The Head Nurse's report to Macon of the incident clearly shows, however, that the patient struck his head and was complaining of chest pain. The report also indicates De Leon's refusal to see the patient.[10]

(3) "De Leon was given credit for his residency training."

From that De Leon reasons that Macon meant De Leon did not satisfactorily complete his training and was not a competent resident. A reasonable jury could not have drawn the inference that "given credit for completing residency at St. Joseph" meant that De Leon did not satisfactorily complete the residency. He literally was given credit for completing his residency at St. Joseph.

(4) "Dr. De Leon failed to respond to emergencies."

De Leon has referred to Macon's appraisal form, wherein Macon checked "yes" in answer to a question asking if there had been "instances when this physician failed to respond to emergencies." In the space provided for comment, however, Macon wrote "According to Nurse Practitioners."

A nurse practitioner had, indeed, reported De Leon's failure to respond. Furthermore, the record is replete with references to complaints by nurses concerning De Leon, one at least referring to failure to respond to an emergency.

(5) "Two appraisals said De Leon was considerably below average."

---

10. Despite De Leon's implications, evidence of what a publisher *could* have known had he investigated further is not relevant to defeating a conditional privilege. *See A.S. Abell Co. v. Barnes,* 258 Md. 56, 78–79, 265 A.2d 207, 220–21 (1970), *cert. denied,* 403 U.S. 921, 91 S.Ct. 2224, 29 L.Ed.2d 700 (1971); *Happy 40, Inc. v. Miller,* 63 Md. App. 24, 36–38, 491 A.2d 1210, 1216–17, *cert. denied,* 304 Md. 299, 498 A.2d 1185 (1985). *See also Kapiloff v. Dunn,* 27 Md.App. 514, 540, 343 A.2d 251, 269 (1975), *cert. denied,* 426 U.S. 907, 96 S.Ct. 2228, 48 L.Ed.2d 832 (1976) (holding "failure to investigate cannot satisfy the constitutional test of reckless disregard").

Macon's letter accurately stated "[t]wo of the other appraisals stated that De Leon should not be accepted on the medical staff and they felt he was considerably below average and not acceptable."

(6) "No one had been accepted for privileges who had failed part I of the boards during Dr. Macon's tenure as Chief of Surgery."

Macon did so state at his deposition, but qualified it by saying "to his knowledge." An application in the record does indicate that an individual's application for general surgery staff privileges was evidently approved, though he or she did not pass part one of the board examinations.

(7) There were "numerous incidents" in which Dr. De Leon failed to respond to calls from nurses and physicians before December 27, 1983.

The record reveals that there clearly were many such incidents.

De Leon has proceeded to list various other "facts" and anomalies which, even if true, do not bear out his claims. A mere scintilla of evidence does not suffice to provide factual support for De Leon's claims of wanton behavior and bad faith. De Leon's "facts" are nothing more than conclusory allegations. Of the above "falsities," only one is supported *at all*, and, with its accompanying qualification, is hardly dispositive. De Leon has not even approached a showing of the extreme, wanton behavior needed to disregard the release.

Aside from the lack of false statements, De Leon has failed to demonstrate any basis for a claim of bad faith or intent. For example, his charge that Macon attempted to "get Dr. DelCarmen to change his evaluation of Dr. De Leon" is unfounded. According to DelCarmen's deposition, Macon merely asked him the not unwarranted question whether he stood by what he had written.

De Leon has sought to produce relevant evidence by pointing to the fact that Macon did not mention in his letter to the Board that three doctors supported De Leon's application. The Board had the evaluations of the three doctors, anyway, so the failure to mention hardly borders on deception, particularly as Macon was not responsible for summarizing every evaluation. Furthermore, Macon was only fulfilling his responsibilities by pointing out the unfavorable evaluations. Negative appraisals of De Leon were entitled to greater weight in this context (particularly where even the *best* appraisals were "average").

De Leon resents that Macon "ridiculed" him while De Leon was assisting in surgery. Macon stated that he asked De Leon questions relating to the operation, as was his practice. De Leon could answer none of them. The practice is a normal one so, even if De Leon felt ridiculed, it was harmless since the board "accepted" De Leon's explanation that he really knew the answers, but just did not express them.

Among the other allegations and assertions produced by De Leon, we can find no basis for charges of "willful misconduct." "Unsupported allegations as to motive do not confer talismanic immunity from Rule 56." *Ross v. Communications Satellite Corporation*, 759 F.2d 355, 365 (4th Cir. 1985). Without support as to intent or wantonness, the release precluded recovery on every claim De Leon has alleged.

### B.

■ Turning to the issue of whether there was publication, to state a viable claim for defamation De Leon must establish:

(a) a false and defamatory statement concerning another;

(b) an unprivileged publication to a third party;

(c) fault amounting to at least negligence on the part of the publisher; and

(d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

Restatement (Second) of Torts, § 588 at 155 (1977). *See Jacron Sales Co. v. Sindorf*, 276 Md. 580, 596–97, 350 A.2d 688, 697–98 (1976); *Mareck v. Johns Hopkins University*, 60 Md.App. 217, 223, 482 A.2d

17, 20–21 (1983), *cert. denied,* 302 Md. 288, 487 A.2d 292 (1985).

■ The district court found De Leon's defamation claims insufficient, *inter alia,* because there had been no publication of defamatory statements to a third party. The Hospital has not published its decision denying De Leon privileges. De Leon argues that he will be forced to reveal the fact of denial when applying for other positions, resulting in a compelled "self-publication." *See Lewis v. Equitable Life Insurance Society,* 389 N.W.2d 876, 886–88 (Minn.1986). The theory of self-publication has not gained widespread acceptance and De Leon could cite no Maryland authority for his proposition. On the other hand, *Lewis* has been subjected to some criticism. *See Sarratore v. Longview Van Corp.,* 666 F.Supp. 1257, 1263–64 (N.D.Ind.1987) (criticizing *Lewis* ); Restatement (Second) of Torts § 577 at 206 (rejecting self-publication). The district court concluded that the Maryland Court of Appeals, at least on the facts presented here, would not adopt self-publication. We do also, bearing in mind that, otherwise, the theory of self-publication might visit liability for defamation on every Maryland employer each time a job applicant is rejected.

The district court also found that during the application process Macon acted solely in his capacity as a Hospital official, and all the allegedly defamatory statements were made to other Hospital officials. Thus, the district court reasoned, there was no publication to a "legally distinct third party."

■ Assuming the district court was incorrect, *see Hanrahan v. Kelly,* 269 Md. 21, 32–37, 305 A.2d 151, 158–60 (1973); Restatement (Second) of Torts § 577, comment e, at 203, such a publication may not be *actionable* where a conditional privilege exists. Here, as we discuss below, Macon's communications may enjoy a qualified privilege, whether from a legal or moral duty to convey the information, or from a mutual interest of the communicator and recipient in the subject matter. *See Simon v. Robinson,* 221 Md. 200, 206, 154 A.2d 911, 915 (1959). A finding of conditional privilege would negate a presumption of malice

and shift the burden to the plaintiff to show actual malice. *Hanrahan,* 269 Md. at 29, 305 A.2d at 156.

In short, while the district court probably erred technically in granting summary judgment on the basis of no publication, there has been no *actionable* publication.

### C.

The district court held that, "assuming such intracorporate communication could constitute a publication," Macon's statements were privileged under Maryland law. A conditional privilege protecting this type of communication exists under both statute, Md.Health Occ.Code Ann. §§ 14–601 & 14–603, and the common law. Section 14–601 provides, in pertinent part:

(f) *Immunity from civil liability.*—A person who acts in good faith and within the scope of jurisdiction of a medical review committee is not civilly liable for any action as a member of the medical review committee or for giving information to, participating in, or contributing to the function of the medical review committee.

Section 14–603 provides, in pertinent part:

(c) *Immunity from civil liability.*—A person described in subsection (b) of this section is not civilly liable for giving information to any hospital, hospital medical staff, related institution, or other health care facility, professional society, medical school, or professional licensing board, if the person:

(1) Gives the information in good faith and with the intention of aiding in the evaluation of the qualifications, fitness, or character of a physician; and

(2) Does not represent as true any matter that the person does not reasonably believe to be true.

■ Macon clearly is protected by the two statutory sections. Furthermore, although the court did not address it, Macon also enjoyed the benefit of a conditional privilege at common law. Maryland recog-

nizes that communications arising in an employment context or by common interest in the subject matter are privileged. *See, e.g., General Motors Corp. v. Piskor,* 277 Md. 165, 352 A.2d 810 (1976) *Hanrahan v. Kelly,* 269 Md. 21, 305 A.2d 151 (1973); *Exxon Corp. v. Schoene,* 67 Md.App. 412, 508 A.2d 142 (1986). The privilege is particularly apt in the present context, since the privilege, along with others, arose by way of recognition of the desirable public benefit of encouraging uninhibited communication where a public or private duty may lie. *See Simon v. Robinson,* 221 Md. 200, 206, 154 A.2d 911, 915 (1959). This concept was expressed in *Hanrahan,* 269 Md. at 31, 305 A.2d at 157:

> Stated in another fashion, a communication is conditionally privileged when the circumstances induce a reasonable belief that the recipient is one to whom the publisher is under a legal duty to publish the defamatory matter or is a person to whom its publication is otherwise within the general standards of decent conduct.

As Macon had a reasonably perceived duty to communicate the information he possessed to the Credentials Committee, his communications were privileged.

■ Once, by statute or common law, a conditional privilege has been established it must be overcome by a showing of *New York Times* malice. *Marchesi v. Franchino,* 283 Md. 131, 139, 387 A.2d 1129, 1133 (1978). *See New York Times Co. v. Sulli-* *van,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Thus, De Leon had to show Macon knew his statements were false or acted with reckless disregard as to their truth to escape the privilege bar. *New York Times,* 376 U.S. at 279–80, 84 S.Ct. at 725–26.[11] He has, as indicated earlier in this opinion, clearly failed to do so.

### D.

■ Finally, the district court found, in the context of the entire record, that none of the statements were defamatory. The court was correct. Many of the statements were indeed Macon's opinion, labelled as such. *See Potomac Valve and Fitting, Inc. v. Crawford Fitting Co.,* 829 F.2d 1280, 1286 (4th Cir.1987) (First Amendment protects statements of opinion). And, as the district court noted, where Macon reported factual incidents that De Leon denied, he consistently noted De Leon's denial or explanation.

This opinion has been as exhaustive (or exhausting) as it has been for De Leon's contentions portend potentially serious consequences for a professional at the threshold of his career. Yet, especially where the risks of unsatisfactory performance are particularly unacceptable, as in a hospital where matters of life and death are all too frequent, the doctor in De Leon's position

---

11. In *Hohman v. A.S. Abell Co.,* 44 Md.App. 193, 200–01, 407 A.2d 794, 798 (1979), the court discussed the proof of malice required:

> "The New York Times or the so called 'constitutional malice' doctrine focuses primarily on the element of scienter. Knowing falsity or reckless disregard for truth involves proof of a 'high degree of awareness of ... probable falsity ...,' *Garrison v. Louisiana, supra,* [379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) ], such that the defendant 'entertained serious doubts as to the truth of his publication.' *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). *Accord Marchesi v. Franchino,* 283 Md. 131, 387 A.2d 1129 (1978)."

[*Delia v. Berkey,* 41 Md.App. 47, 51–53, 395 A.2d 1189, 1192 (1978).] To prove "reckless disregard", as required by *New York Times v. Sullivan, supra,* appellant had to adduce sufficient evidence to permit the conclusion that appellee in fact entertained serious doubts as to the truth of the publication. *See St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968), where the Court stated:

> "These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. *There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts show reckless disregard for truth or falsity and demonstrates actual malice."* [Emphasis added.]"

should ponder whether "the fault, dear Brutus, is not in our stars."

The judgment is

AFFIRMED.[12]

---

12. Appellant's motion to strike part of the record is denied.