**James N. SIMON, M.D., Plaintiff,**

v.

**UNION HOSPITAL OF CECIL COUNTY, INC., Steve Owen, Kenneth Lewis, M.D., Archie Sirianni, M.D., and John Corbin, M.D., Defendants.**

**Civil No. S–97–1955.**

United States District Court,
D. Maryland.

June 26, 1998.

Bernard Nash, Laura B. Feigin, Dickstein Shapiro Morin & Oshinsky, LLP., Washington, DC, Mary S. Santamarina, Robin L. Cohen, Gregory A. Blue, Dickstein Shapiro Morin & Oshinsky, LLP, New York City, for Plaintiff.

Donald L. DeVries, Jr., Teri Kaufman Leonovich, Goodell, DeVries, Leech & Gray, LLP, Baltimore, MD, for Defendants.

### MEMORANDUM OPINION

SMALKIN, District Judge.

This matter is before the Court on Defendants' Motion for Summary Judgment. The motions have been fully briefed, and no oral argument is deemed necessary. Local Rule 105.6 (D.Md.).

### I. Factual Background

James N. Simon, M.D., Plaintiff, was hired as the Chief of Anesthesia at Union Hospital of Cecil County ("Union") in January, 1993, under a three-year contract, with automatic one-year renewal periods. The contract provided that "this Agreement may, in the discretion of Hospital, be immediately terminated upon the giving of notice in the event that . . . (ii) Physician is guilty of any conduct tending to injure the reputation of Hospital, . . . as determined by Hospital's Board of Directors, after Physician is afforded the opportunity to a hearing before Hospital's Board of Directors, whose decision shall be conclusive." Employment Agreement, § 11(b). The contract did not contain a pro-

vision for the suspension of Simon's employment.

Defendants Archie Sirianni, M.D. and John Corbin, M.D. are anesthesiologists at Union. Sirianni and Corbin, Simon's successor as Chief of Anesthesia at Union, told Steve Owen, President and CEO of Union, and Kenneth Lewis, M.D., the Physician Advisor to the Medical Staff, that Simon was improperly adding time to billing slips and that he had improperly altered a patient's medical record. At an August 22, 1996, meeting, Owen confronted Simon with these allegations of wrongdoing. At this meeting, Owen told Simon that his employment was being immediately suspended (with pay) subject to termination pending a final investigation. Union's attorneys sent Simon a letter, dated September 6, 1996, advising Simon that Union had concluded its investigation and that Union was prepared to terminate Simon. The letter stated that Simon was entitled to an informal appearance before Union's Board of Directors. Simon did not appear before the Board. Simon resigned on September 19, 1996.

Union sent a report to the Maryland Board of Physician Quality Assurance (the "BPQA"), dated August 30, 1996, which had an "X" in a box marked "Emergency Suspension" and commented that "Suspension of employment based on apparent violation of billing practices as an employee of Union Hospital. Suspension based on inappropriate alteration of an original medical record." Defs.' Ex. 53.

Union sent an adverse report, about September 5, 1996, to the National Physician's Data Bank (the "NPDB") indicating "suspension of employment based on apparent violation of billing practices as an employee of Union Hospital. Suspension based on inappropriate alteration of an original medical record." Plt.'s Ex. 41. Apparently as the result of codes provided by Union, the NPDB-generated adverse action report classified the action as clinical privileges suspended, unprofessional conduct. *Id.*

After Dr. Simon's resignation, Union sent a report to the BPQA, about September 27, 1996, stating that Simon had voluntarily resigned "during an investigation of an appar-

ent violation of billing practices and inappropriate alteration of an original medical record. Physician retains his privileges at the Hospital but under the terms of his employment contract with the Hospital, is not permitted to exercise those privileges for a period of one year." Defs.' Ex. 55. Union also sent another adverse report to the NPDB, about September 25, 1996, with the same information as the report sent to BPQA, that Simon had resigned during an investigation. Plt.'s Ex. 43.

In January 1997, Simon began employment as an anesthesiologist with Atlantic Medical Anesthesia Associates in New York, under a five-year contract. Atlantic Medical provides anesthesia services to patients at South Nassau Community Hospital and conditions the employment of its anesthesiologists on being granted privileges at South Nassau.

Several months after Simon began this job, Defendants Owen, Corbin and Lewis had telephone conversations with representatives of South Nassau and Atlantic Medical, wherein these Defendants made allegedly defamatory statements. Lawrence Weiss, a South Nassau administrator, testified in his deposition that, on May 16, 1997, he called Union and spoke to Owen, Union's President and CEO. According to Weiss, Owen told him that Simon's privileges and employment had been terminated as a result of billing fraud. Plt.'s Ex. 47, Weiss Dep. at 193–94. In addition, Weiss has testified that Owen told him that "they had reported this to the federal government. The Medicare people came in to review the situation and the hospital was forced to return money, even beyond the one particular case, that the federal government found fraudulent billing practices." *Id.* at 195. Owen has testified that this action by the federal government did not occur, and he denies that he ever said that it did occur. Plt.'s Ex. 3, Owen Dep. at 510–11.

Weiss and Dr. Steven Shoum, of Atlantic Medical, then spoke to Lewis and Corbin. Lewis, physician advisor to the medical staff at Union, told Shoum that Simon had been terminated as a result of improper billing procedures and that his "medical privileges went out with his employment." Plt.'s Ex. 26, Shoum Aff. ¶ 17. Lewis also told Weiss

that Simon "took hospital equipment that was not authorized," and that Simon had committed billing fraud, which had caused Union to pay large penalties. Plt.'s Ex. 47, Weiss Dep. at 198. Owen has testified that at the time of this communication, no federal agency had required Union to pay penalties. Plt.'s Ex. 3, Owen Dep. at 510–11.

Corbin told Shoum that Simon was a person with a "total lack of moral character," "unethical," "shady," "not up front," "caught up with himself" and "smooth talking." Plt.'s Ex. 26, Shoum Aff. ¶ 20. Corbin also told Shoum that Simon improperly used hospital equipment, such as cryo-pain equipment, for his own personal pain practice. *Id.* at ¶ 21. Apparently, Union did not have cryo-pain equipment at the time. Plt.'s Ex. 4, Corbin Dep. at 578. In addition, Corbin told Shoum that Simon "drew a large salary, but did no work," avoided risky cases and took only easy cases. Corbin also told Shoum that Simon had trouble with his prior employer. Plt.'s Ex. 26, Shoum Aff. ¶ 24.

At least in part as the result of these conversations, a representative of South Nassau concluded that Simon would never be granted privileges at their hospital. Consequently, Atlantic Medical terminated Simon's employment on May 20, 1997.

On June 20, 1997, Simon filed a diversity action against Defendants, alleging defamation, invasion of privacy, tortious interference with contract, breach of contract, intentional infliction of emotional distress, negligence, and negligent misrepresentation.

## II. *Summary Judgment Standards*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In considering a motion for summary judgment, the court must view the material facts, and all justifiable inferences drawn therefrom, in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct.

2505, 91 L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials .... but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505 (internal citations omitted). A material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.*

### III. Discussion

#### A. Conflict of Law

Neither party has raised conflict of law as an issue in this diversity case, but both parties assume that Maryland law applies (except for the federal and New York statutory immunities). The Court will, therefore, accept the parties' *sub silentio* agreement that Maryland law controls. *See National Bank of Washington v. Pearson*, 863 F.2d 322, 328 n. 5 (4th Cir.1988) (deciding case "under Nevada law on the *sub silentio* agreement that it controls" where defendant did not contest plaintiff's assertion that Nevada law applied). *See also Massachusetts Bay Ins. Co. v. Vic Koenig Leasing, Inc.*, 136 F.3d 1116, 1120 (7th Cir.1998) ("[W]hen neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits ... Courts do not worry about conflict of laws unless the parties disagree on which state's law applies.").

#### B. Defamation

■ In Maryland, there are four elements to establish a *prima facie* case of private party defamation: (1) publication of a defamatory communication; (2) falsity; (3) fault by a negligence standard; and (4) harm. *Gooch v. Maryland Mechanical Sys. Inc.*, 81 Md.App. 376, 391, 567 A.2d 954, *cert. denied*, 319 Md. 484, 573 A.2d 807 (1990).

##### 1. Statements to Atlantic Medical and South Nassau

■ In Count I, Simon contends that Owen, Lewis and Corbin defamed him when they made statements to Atlantic Medical and South Nassau Community Hospital. *See* Factual Background section, *supra.* Because Simon signed a broad waiver, the voluntariness of which he does not contest, a reasonable juror could not find Defendants liable for statements that they made in good faith and without malice.[1] *See McDermott v. Hughley*, 317 Md. 12, 27, 561 A.2d 1038 (1989) ("Consent is a defense to a defamation action."). This waiver authorized Atlantic Medical and South Nassau to consult with Union, and Simon released from liability "any and all individuals and organizations who provide information to the hospital, or its Medical Staff, in good faith and without malice concerning my professional competence, ethics, character and other qualifications for staff appointment, and clinical privileges, and I hereby consent to the release of such information." Defs.' Ex. 62. *See also Bagwell v. Peninsula Regional Medical Ctr.*, 106 Md.App. 470, 509, 665 A.2d 297 (1995) ("One who invites the publication knowing that its contents may damage his reputation cannot complain when his fears come true.") (quoting *McDermott*, 317 Md. at 27, 561 A.2d 1038), *cert. denied*, 341 Md. 172, 669 A.2d 1360 (1996). The language of the release is sufficiently broad to encompass all of the statements made about Simon (including those about his character).

Simon has not provided sufficient evidence that would permit a reasonable juror to find that the statements made by Owen, Lewis, or Corbin were made in bad faith or with malice. One relevant factor is that Defendants did not initiate the conversations with Atlantic Medical or South Nassau, but were simply responding to inquiries they received. *See Stevenson v. Baltimore Baseball Club*, 250

---

[1.] Defendants also rely on New York Public Health Law § 2805–k as a defense in this action. That law provides, "Any hospital or hospital employee providing [certain information about the physician] in good faith shall not be liable in any civil action for the release of such information." Plaintiff contends that Defendants waived the affirmative defense of immunity under New York law, because they failed to plead it as an affirmative defense. In light of the broad release that Simon signed, it is not necessary for the Court to determine whether this statute shields Defendants from liability in this case.

Md. 482, 487, 243 A.2d 533 (1968), *overruled on other grounds, Marchesi v. Franchino,* 283 Md. 131, 387 A.2d 1129 (1978). Indeed, in the entire four-month period that Simon had been working at Atlantic Medical in New York, no one from Union had ever tried to contact Atlantic Medical to discuss Simon. Another relevant factor is that Defendants did not provide any information about Simon until they assured themselves that Simon had executed a release. Plt.'s Ex. 47, Weiss Dep. at 138. Certainly, whether Owen told Weiss that the federal government had come to Union and found fraudulent billing is a disputed fact. The Court does not find, however, that this disputed fact, were it to be resolved in Simon's favor, would be sufficient for a reasonable jury to return a verdict for Simon on the issues of good faith and malice. *See Anderson,* 477 U.S. at 249–52, 106 S.Ct. 2505.

Simon argues that it is a sign of Defendants' lack of good faith that Defendants provided such information to Atlantic Medical and South Nassau despite an agreement between the parties that Union would provide only Simon's credentials file to prospective employers. Plt.'s Ex. 45, Mitchell Dep. at 87–88. A reasonable juror could not find this fact a sign of Defendants' lack of good faith or as a demonstration of malice, in light of the fact that Defendants received the release form signed by Simon *subsequent to* any agreement the parties might have had regarding the particulars of the information Union would or would not provide. Simon advances the fact that Owen, Lewis, and Corbin made statements to Simon's future employer as another sign of lack of good faith, because the parties agreed that only Union's Vice President of Human Resources would be permitted to talk to prospective employers. *Id.* at 86–87. Simon has not presented evidence, however, to show that Owen, Lewis, or Corbin knew about this agreement, which would be required before finding that their comments were not made in good faith or were made maliciously. Thus, the Court will grant Defendants' Motion for Summary Judgment as to Count I.

## 2. *BPQA and NPDB Reports*

In Count II, Simon contends that Union defamed him when it sent allegedly false reports to the BPQA and the NPDB. *See* Factual Background section, *supra.* Defendants assert that the statements made in the reports were true, and that they are entitled to immunity under both Maryland and federal law.

The statements made in the narrative section on the first set of reports sent to both the BPQA and the NPDB are substantially correct, if not entirely correct, that Simon was suspended based on an apparent violation of billing practices and inappropriate alteration of an original medical record. Therefore, these statements could not be the basis for a finding of defamation at trial, because the burden is on Simon to prove that these statements were false, and a false statement is one that is not "substantially correct." *See Batson v. Shiflett,* 325 Md. 684, 726, 602 A.2d 1191 (1992). In federal cases, it has been recognized that, when appropriate, the Court can settle this issue without trial. *Hopkins v. Lapchick,* 981 F.Supp. 901, 904 (D.Md.), *aff'd table,* 129 F.3d 116 (4th Cir.1997). Thus, Simon would not be able to prove an element of his defamation claim, falsity, with respect to these statements.

The report to the BPQA on August 30, 1996 had an "X" in the box marked "Emergency Suspension." The evidentiary record indicates that there was no "emergency" in the sense that people's lives were at risk. Under Maryland law, defendants are immune from civil damages for the reports sent to the BPQA, if the statements were made in good faith and without malice. *See* Md.Code Ann., Health Occ. § 14–413(d) (referring to Md.Code Ann., Cts. and Jud. Proceedings § 5–715(d)). Union did not pen-in the word "emergency," but marked a box that appeared to be the most accurate description of the action taken against Simon, from the seven choices given. For scientific precision, Union probably should have selected "Other" and given a description as "Suspension." The fact that Union's counsel directed Union to mark the box "Emergency Suspension," the only choice that included

the word "suspension," coupled with the fact that Union provided, in the narrative section, the factual basis for Simon's suspension (which clarified that the suspension was not a true "emergency"), a reasonable juror could not find that the statement "Emergency Suspension" in this report was made without good faith or with malice.

Although the BPQA report about Simon's resignation states that Simon resigned during an investigation, the facts show that Simon resigned after the investigation into Simon's conduct had ended. Plt.'s Ex. 41 at 466. Again, this is not sufficient evidence to infer that these statements were made without good faith or with malice, given that Union's counsel drafted the reports and advised Union to send them to comply with the law, and given how close in time Simon's resignation was to the conclusion of the investigation (less than two weeks).

The Health Care Quality Improvement Act of 1986 (the "Act"), 42 U.S.C. § 11101, *et seq.*, establishes a national reporting system and provides immunity from damages for persons participating in professional review activities. Simon argues that the Act's immunity is inapplicable to the reports sent to the NPDB, because Union acted against Simon as an employment contract matter, and not pursuant to the hospital's professional review process. Defendants argue that, because their attorney thought Simon's suspension was reportable under the Act, the immunity applies. Defs.' Reply Mem. at 16. If the action by Union in suspending Simon was not within the scope of the Act, the Act—and its immunity—is inapplicable, regardless of what Union's counsel thought or advised Union. It is not clear to this Court whether Congress intended that actions such as Owen's in suspending Simon pursuant to the contract would constitute "professional review action" under the Act, entitling Defendants to the Act's immunity.

 Assuming, *arguendo*, that the Act does not apply, the Court finds that the reports to the NPDB nonetheless enjoy Maryland's common-law qualified privilege, that protects, for policy reasons, certain types of communication. *See De Leon v. St. Joseph Hosp.*, 871 F.2d 1229, 1237–38 (4th Cir.), *cert.*

*denied*, 493 U.S. 825, 110 S.Ct. 87, 107 L.Ed.2d 52 (1989). The common law recognized that a person should be protected against "civil liability for defamation where, in good faith, he publishes a statement in furtherance of his own legitimate interests, or those shared in common with the recipient or third parties, or where his declaration would be of interest to the public in general." *Marchesi*, 283 Md. at 135–36, 387 A.2d 1129; *Hanrahan v. Kelly*, 269 Md. 21, 28, 305 A.2d 151 (1973) (defamatory statement privileged when communicating party and recipient have mutual interest in subject matter). Here, Union sent the reports to the NPDB, upon advice of counsel, in furtherance of its legitimate interest in obeying the law, and Union and the recipients of the reports have a mutual interest in the competency and professional ethics of a physician. *See also Sibley v. Lutheran Hosp.*, 871 F.2d 479, 484 (4th Cir.1989) ("If a conditional privilege should *ever* operate, indeed if there is one instance where society should encourage uninhibited communication, it is in the review of the competency of medical professionals."). Moreover, Union had a good faith belief, based on advice of counsel, that it had a legal duty to send these reports. *See Fresh v. Cutter*, 73 Md. 87, 20 A. 774 (1890) (holding that statement by prior employer to future employer that plaintiff will steal and that plaintiff stole money from prior employer was privileged communication where defendant honestly believed he owed duty to future employer).

 To defeat the common-law qualified privilege, Simon must prove actual malice. *See De Leon*, 871 F.2d at 1238; *see also Telnikoff v. Matusevitch*, 347 Md. 561, 594, 702 A.2d 230 (1997). The "actual malice" required to overcome the privilege in a defamation action is knowing falsity or reckless disregard for truth, which involves a "high degree of awareness of ... probable falsity, such that the defendant entertained serious doubts as to the truth of his publication." *Marchesi*, 283 Md. at 137, 138–39, 387 A.2d 1129 (internal quotations and citations omitted). Ill-will and bad motives toward plaintiff are not enough to overcome a qualified

privilege in a defamation action. *Id.* at 138, 387 A.2d 1129.

The code supplied by Union's counsel on the report sent to the NPDB about September 5, 1996, caused an adverse reaction report to be generated that indicated that Simon's clinical privileges were suspended due to unprofessional conduct. Although it appears that an improper code may have been used, another report, sent within two weeks, on about September 17, 1996, clarified the status of Simon's clinical privileges by indicating that "Physician retains his privileges at the Hospital but the Physician is not permitted to exercise those privileges for a period of one year." Defs.' Ex. 55. Owen testified that he did not review the reports before they were sent, Plt.'s Ex. 3, Owen Dep. at 454, and, although one might argue such action by the President and CEO of a hospital is negligent, it does not prove that degree of culpability amounting to actual malice under Maryland law.

For the same reasons that the evidence did not show that the statement in the report sent to the BPQA that Simon resigned during an investigation was made without good faith or with malice, discussed *ante*, the Court finds that the same statement made to the NPDB was not made with actual malice.

Union's counsel played a key—indeed cardinal—role with respect to the reports sent to the BPQA and the NPDB. Union's counsel advised Union that it must send the reports, drafted the content of the reports, directed which numerical codes to select and which boxes to mark, and reviewed the reports for accuracy. Further, Simon has presented no evidence that anyone at Union even reviewed the reports, or should have reviewed the reports, or that it was unreasonable to rely on counsel under the circumstances. Although Simon contends that Union failed to give counsel correct information, Union's counsel has testified that he advised Union to send these reports based on his independent review of documents provided by Union, Ex. 74, Sarbanes Dep. at 30–31, and there is insufficient evidence to infer that Union's counsel was not provided with information necessary for counsel to advise Union in a knowledgeable fashion.

Based on the above discussion, the Court will grant Defendants' Motion for Summary Judgment as to Count II.

### 3. Statements by Sirianni and Corbin to Hospital Administrators

In Count III, Simon contends that Sirianni and Corbin defamed him when they told Union administrators that Simon added time to billing slips and altered a medical record.

#### a. Qualified Privilege

■ Under Maryland law, statements made within the context of an employer-employee relationship in furtherance of the protection of a mutual interest enjoy a qualified privilege. *See Hanrahan v. Kelly,* 269 Md. 21, 28, 305 A.2d 151 (1973). Sirianni, Corbin and Simon were fellow anesthesiologists at Union and, as such, Sirianni and Corbin reasonably believed that facts existed (that Simon added time to billing slips and altered a medical record) which Union, sharing a common interest, was entitled to know. Sirianni and Corbin conveyed the information to hospital administrators. The qualified privilege is meant to protect just this type of communication. Especially in a hospital setting, it is important that employees report suspected wrongdoing to administrators. A potential lawsuit would discourage employees from doing so, with the result that improprieties would fester unchecked. *Cf. Sibley,* 871 F.2d at 484.

#### b. Defendants' Failure to Affirmatively Plead Qualified Privilege

■ Defendants may rely on the qualified privilege defense even if they failed to assert it in their answer. The Fourth Circuit has allowed affirmative defenses to be pled in pre-trial motions, and the Court finds that failure to plead the affirmative defense of qualified privilege in Defendants' answer does not constitute waiver here. *See Polsby v. Chase,* 970 F.2d 1360, 1364 (1992) (no abuse of discretion by district court in permitting defendant to raise defense of time bar notwithstanding failure to raise it in answer), *vacated on other grounds,* 507 U.S. 1048, 113 S.Ct. 1940, 123 L.Ed.2d 646 (1993).

Further, waiver is not automatic, but requires a showing of prejudice or unfair surprise, *see generally* 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1278 (1969 & Supp.1984), and Defendants have shown neither. Given that Defendants did plead the affirmative defense of immunity under Maryland law, which implicates the same issues as the qualified privilege defense—good faith and malice—Simon cannot argue that he is prejudiced or unfairly surprised by the qualified privilege defense. Moreover, Defendants pled the affirmative defense of the doctrine of release which notified Simon that Defendants were relying on Simon's executed release as a defense, which also implicated good faith and malice issues. Accordingly, Plaintiff was motivated to discover information relevant to whether Defendants acted in good faith and without malice, precluding a finding that Simon is prejudiced or unfairly surprised by the qualified privilege defense.

### c. *Actual Malice*

As discussed above, the qualified privilege may be defeated by a showing of actual malice. Here, there is insufficient evidence that either Sirianni or Corbin acted with actual malice when they reported to hospital administrators. Sirianni told administrators that Simon added Sirianni's name to a patient's medical record to indicate that Sirianni had performed an awake laryngoscopy on the patient even though Sirianni did not believe that he had performed the procedure. Simon does not dispute that he added Sirianni's name to the record. There is no evidence to permit a reasonable juror to infer that Sirianni knew the statements were false when he made them or that he made them with a reckless disregard for the truth. The only evidence Simon has presented to show that there is a chance that Sirianni performed the awake laryngoscopy is Corbin's statement to Weiss that Sirianni performed it. But that does not show that *Sirianni* had knowledge or reckless disregard for the truth of the statement. Simon's testimony that the patient himself described the physician as "a short little guy with black hair," (supposedly Sirianni's features) does not assist Simon because, apart from being hearsay

and inadmissible at trial, *see* Fed.R.Civ.P. 56(e), it is irrelevant to Sirianni's state of mind at the time he made the statement. The "one key undisputed fact" that Sirianni "despised" Simon, without more, does not show actual malice. *See Orrison v. Vance,* 262 Md. 285, 295–96, 277 A.2d 573 (1971).

With respect to Sirianni's and Corbin's reports to hospital administrators that Simon had added time to billing slips of other anesthesiologists, there is no dispute that Simon did add time. Sirianni and Corbin did not have the responsibility to investigate whether Simon had a legitimate reason for doing so. Rather, they had a responsibility, as employees of Union, to report their knowledge of what might be improper billing procedures to the hospital's administrators, and they did so.

In sum, Defendants Sirianni's and Corbin's statements to Union administrators are entitled to a qualified privilege under Maryland law, and a review of the record fails to reveal "sufficient evidence favoring [Plaintiff] for a jury to return a verdict for that party" on the issue of actual malice. *See Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. Thus, summary judgment is appropriate as to Count III, and it will be granted.

### C. *Invasion of Privacy (False Light)*

In Count IV, Simon contends that Union placed him in a false light, thus invading his privacy, when Union filed allegedly false reports with the NPDB. Defendants are entitled to judgment where the statement is protected by a qualified privilege. *See Steer v. Lexleon, Inc.,* 58 Md.App. 199, 472 A.2d 1021 (1984) (privilege discussion applied identically to defamation and false light claims). Based on the same reasoning in the discussion about the qualified privilege with respect to the NPDB report in Count II, *supra,* the Court will grant Defendants' Motion for Summary Judgment as to Simon's false light claim.

### D. *Breach of Contract (Resignation Agreement)*

In Count V, Simon alleges that Union breached a resignation agreement with Simon when Owen, Lewis, and Corbin spoke

with Weiss and Shoum on May 16, 1997. The resignation agreement (which Defendants do not concede is a contract) consists of a September 19, 1996, letter from Union's counsel to Simon's counsel. The letter states that "[i]n response to any follow-up questions [from any source inquiring about Simon's employment or privileges], the medical staff office will indicate that its policy requires a release from the physician before any additional information is provided." Plt.'s Ex. 46. Simon's former counsel testified that this language meant that Union would provide *only* Simon's credentials file upon receipt of a release. Plt.'s Ex. 45, Mitchell Dep. at 86–88.

 "Construction of a contract is, in the first instance, a question of law for the Court to resolve. Where the language of a contract is clear and unambiguous, there is no room for construction and we must presume that the parties meant what they expressed." *Shapiro v. Massengill*, 105 Md. App. 743, 754, 661 A.2d 202 (internal citations omitted), *cert. denied*, 341 Md. 28, 668 A.2d 36 (1995). The plain meaning of the contract is that a signed release from Simon would permit Union to give "any additional information," and the language of the contract does not limit Union to providing only Simon's credentials file. There is no ambiguity, so Simon's former counsel's testimony about what the language meant is irrelevant, and there is no dispute of material fact as to Count V.

### E. Breach of Contract (Employment Agreement)

 In Count VI, Simon alleges that Union breached the December 2, 1996 Employment Agreement with Simon. First, Simon contends that Union breached the contract when it suspended Simon's employment. Although the contract did not say that Union *could* suspend Simon, the contract did not say that Union *could not* suspend him. The Court agrees with Defendants that it would be an unreasonable construction of the contract to conclude that the hospital had no right to discipline Simon in any manner short of terminating his employment. And, given that Union could terminate Simon under certain circumstances, Simon cannot complain when Union took the less drastic step of suspending him *with pay* while it investigated whether such termination, pursuant to the contract, was appropriate.

 Next, Simon alleges that Union breached the Employment Agreement by deciding that Simon should be terminated before affording him the opportunity for a hearing before the Board of Directors to ascertain whether he was "guilty of conduct tending to injure the reputation of the Hospital." Union offered Simon an "informal appearance" before the Board of Directors prior to its decision, and asked that Simon respond by September 13, 1996, as to whether he wished to appear before the Board. Plt.'s Ex. 40, Ltr. from Sarbanes to Mitchell dated September 6, 1996. Simon did not appear before the Board, apparently because his attorney, who could have been present at the appearance, did not believe it would serve Simon's purpose to make a record before a Board that the attorney perceived was going to rubber stamp Owen's decision. Defs.' Ex. 46, Mitchell Dep. at 59–61. Simon argues that an "informal appearance" did not constitute a "hearing" as required by the contract because the informal appearance would not have given him the right to cross-examine witnesses or introduce evidence. There is no evidence to show that the intent of the parties, regarding what type of "hearing" Simon was entitled to, envisioned a full-blown hearing with due process protections. Rather, the plain meaning of "opportunity for a hearing" is that Union give Simon a chance to be heard before the Board of Directors, and that is exactly what Union offered Simon. Simon declined the offer, and his reasons for doing so are irrelevant to whether he was given the opportunity to be heard. The September 11, 1996 letter to Union's malpractice carrier, sent prior to the hearing date, indicating that "effective immediately Simon was no longer a member of Union's medical staff," is not a material fact regarding whether Simon was afforded an opportunity for a hearing. Owen testified that he did not want the hospital paying for insurance that was unnecessary due to Simon's suspension.

### F. Tortious Interference with Economic Relations

In Count VII, Simon alleges that Owen, Corbin and Lewis tortiously interfered with Simon's economic relations with Atlantic Medical when they spoke to Weiss and Shoum about Simon.

The tort of intentional interference with economic relationships has the following four elements: (1) intentional and willful acts; (2) calculated to cause damage to the plaintiff in his lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting. *Alexander & Alexander Inc. v. B. Dixon Evander and Assoc.*, 336 Md. 635, 652, 650 A.2d 260 (1994). Based on the record here, and its earlier discussions regarding whether Defendants acted with bad faith or malice, the Court sees no basis for concluding that Simon has satisfied the third element, that the statements to South Nassau were made "without right or justifiable cause," that is, with malice. Owen, Lewis, and Corbin were responding to a credentialing inquiry, and they spoke only after receiving a release signed by Simon. The Court will grant Defendants' Motion for Summary Judgment as to Count VII.

### G. Tortious Interference with Contract with Union

Simon's allegation in Count VIII that Sirianni and Corbin tortiously interfered with his contract with Union is without merit. As a matter of law, an agent of the party to a contract, acting within the scope of the agency, cannot interfere with the contract. *Bagwell*, 106 Md.App. at 503, 665 A.2d 297 (citing *Natural Design, Inc. v. The Rouse Co.*, 302 Md. 47, 71, 485 A.2d 663 (1984)). Although Simon asserts in the Complaint that Sirianni and Corbin were acting outside the scope of their employment, there are no facts that back up this assertion. To the contrary, Sirianni's and Corbin's actions in reporting potential misconduct occurring within the hospital to Union administrators were well within the scope of their employment.

### H. Intentional Infliction of Emotional Distress (Count IX)

Under Maryland law, the tort of intentional infliction of emotional distress consists of the following elements: (1) defendant's conduct must be intentional or reckless, (2) defendant's conduct must be extreme and outrageous, (3) there must be a causal connection between the wrongful conduct and the emotional distress, and (4) the emotional distress must be severe. *Harris v. Jones*, 281 Md. 560, 566, 380 A.2d 611 (1977). The Court finds that there is no dispute as to any material fact that would establish the second or fourth elements of the tort.

Simon has not provided evidence to show that any of the Defendants' conduct was "atrocious" or "utterly intolerable in a civilized community." *Id.* at 567, 380 A.2d 611. As discussed earlier, Defendants followed their counsel's advice in sending reports to the NPDB and the BPQA, and did not initiate statements to Atlantic Medical or South Nassau, but responded to questions only after receiving a release signed by Simon.

Nor has Simon shown that any emotional distress he may have suffered was severe. *See id.* at 570, 380 A.2d 611 (stating, "plaintiff [must] show that he suffered a *severely* disabling emotional response to the defendant's conduct") (emphasis in original). Maryland courts are reluctant to mete out recovery under the tort of intentional infliction of emotional distress, "its balm reserved for those wounds that are truly severe and incapable of healing themselves." *Figueiredo–Torres v. Nickel*, 321 Md. 642, 653, 584 A.2d 69 (1991) (internal citations omitted). Simon has been capable of gaining employment, and he has not presented evidence to show that he suffered the *severe* emotional distress required by Maryland courts to succeed in an intentional infliction of emotional distress action. Simon testified in his affidavit that he is under tremendous stress, requires counseling, is often depressed, despondent and unable to sleep. In all likelihood, Simon has been deeply affected by the events surrounding this case; but his emotional response is not so severe that "no reasonable

man ... should be expected to endure it." *Harris,* 281 Md. at 572, 380 A.2d 611.

Accordingly, Defendants' Motion for Summary Judgment as to Count IX will be granted.

### I. *Negligent Misrepresentation*

■ In Count X, Simon alleges that Union, in the "resignation agreement," negligently misrepresented to Simon that, in response to inquiries, Union would state that Simon's privileges remained intact. *See* Ex. 46, Ltr. from Sarbanes to Mitchell. There is evidence that, in responding to inquiries, Union stated that Simon's privileges "went out with his employment."

■ Because the statement about how Union would respond to inquiries about Simon involved an "expression as to what will happen in the future," it cannot be the basis for a negligent misrepresentation claim. *See Miller v. Fairchild Indus.,* 97 Md.App. 324, 342, 346, 629 A.2d 1293, *cert. denied,* 333 Md. 172, 634 A.2d 46 (1993). But, failure to properly communicate one's current intentions can be a negligent misrepresentation of present fact. *Weisman v. Connors,* 312 Md. 428, 456, 540 A.2d 783 (1988). The problem for Simon here is that there is insufficient evidence to show that, at the time the statement was made, Union intended not to handle inquires about Simon's privileges in the manner that it was representing. See *id.* (Plaintiff must show that at the time the statement was made, the defendant "mistakenly expressed intentions or expectations which were at variance with [the defendants] true state of mind at the time the representations were made."). The only evidence Simon points to here is the fact that two of the three Defendants who spoke with South Nassau made the same false representation that Simon's privileges went out with his employment. The Court finds such evidence insufficient for a reasonable juror to infer that Defendants, when they told Simon that they would tell prospective employers that Simon's privileges remained intact, intended to tell prospective employers that Simon's privileges were marred.

### J. *Negligence*

■ In Count XI, Simon alleges that Union was negligent by failing to meaningfully investigate the allegations against Simon before terminating him. Simon asserts that Union was negligent in the following ways: (1) failing to interview Calinao, attending anesthesiologist on over half of the procedures that formed the basis of the suspension, (2) failing to interview members of the department other than Sirianni and Corbin, (3) failing to contact an expert in anesthesia billing, (4) relying on a draft report by Arthur Anderson, (5) failing to provide Simon with copies of records and seek an explanation from Simon, and (6) failing to submit the allegations to peer review.

■ Simon's Count XI negligence claim is, in reality, nothing more than a "negligent breach of contract" claim, and as such, fails as a matter of Maryland law: "The mere negligent breach of a contract, absent a duty or obligation imposed by law independent of that arising out of the contract itself, is not enough to sustain an action sounding in tort." *Heckrotte v. Riddle,* 224 Md. 591, 595, 168 A.2d 879 (1961). Here, the contract did not specify any duty to investigate, and Union had no independent duty to investigate the allegations of wrongdoing against Simon. *See Coates v. United Parcel Service,* 933 F.Supp. 497 (1996) (citing *Bagwell,* 106 Md. App. at 518, 665 A.2d 297 (1995)) ("in an ... employment relationship ... the employer simply has no duty to investigate allegations of employee misconduct prior to discharging the employee."), *aff'd,* 129 F.3d 116, 1997 WL 702278 (4th Cir.1997) (unpublished). Thus, Simon cannot sustain his burden at trial on Count XI, and summary judgment is appropriate.

### IV. *Conclusion*

Based on the above discussion, the Court concludes that there is no genuine dispute as to material facts on Simon's claims, and that Defendants are clearly entitled to judgment as a matter of law on all of them. Fed. R.Civ.P. 56(c). Therefore, the Court will grant summary judgment in favor of all Defendants. An appropriate order will be entered separately.

## JUDGMENT ORDER

For the reasons stated in a Memorandum Opinion of even date, it is, by the Court, this 26th day of June, 1998, ORDERED:

1. That Defendants' motion for summary judgment BE and the same hereby IS GRANTED;

2. That judgment BE, and it hereby IS, ENTERED in favor of all defendants, against the plaintiff, on all claims, with costs awarded to the defendants; and

3. That the Clerk mail copies hereof and of the said Opinion to counsel.